sult, but rather whether such evidence supports the result reached.").

**Timely Filing of Lien**

█ {17} Hotel also contends that the lien was not proved to have been timely filed. The law requires that the lien be filed within 90 days of completion of the project. NMSA 1978, § 48-2-6 (1979); *see also Garrett Bldg. Ctrs., Inc. v. Hale,* 95 N.M. 450, 453, 623 P.2d 570, 573 (1981) (stating that the lien must be filed within the statutory period or the remedy is unavailable).

{18} Hotel relies on the facts that the agreement between Vantage and Hotel provided that Vantage would send Hotel an invoice when the project was completed, that the invoice was sent in the last week of April, and that counsel for CED acknowledged in her closing argument that the project was "probably completed" on April 25. However, as pointed out in the factual recitation above, there was evidence that the project was not completed until April 26. Again, we do not reweigh the evidence, substitute our judgment for that of the fact finder, or review to determine whether the evidence would have supported a result different from that found below. *See Las Cruces Prof'l Fire Fighters,* 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. There was substantial evidence that the lien was timely filed 90 days from April 26 on July 25.

**CONCLUSION**

{19} The judgment of the trial court is affirmed.

{20} **IT IS SO ORDERED.**

WECHSLER and KENNEDY, JJ., concur.

2006-NMCA-007

126 P.3d 1149

NEW MEXICANS FOR FREE ENTERPRISE, The Santa Fe Chamber of Commerce, Pranzo, Zuma Corporation, Robbie Day, and Santa Fe Hotel Joint Ventures, Plaintiffs–Appellants,

v.

THE CITY OF SANTA FE, Defendant–Appellee.

No. 25,073.

Court of Appeals of New Mexico.

Nov. 29, 2005.

Ellington & Ellington, L.L.C., Kathrin Kinzer–Ellington, T. Glenn Ellington, Santa Fe, for Appellants.

City of Santa Fe, Bruce Thompson, Jones, Snead, Wertheim & Wentworth, P.A., Jerry Todd Wertheim, Santa Fe, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Sidney S. Rosdeitcher, The Brennan Center for Justice, at NYU Law School, Paul K. Sonn, New York, NY, for Appellee.

Rodey, Dickson, Sloan, Akin, & Robb, P.A., Edward Ricco, Jocelyn Drennan, Albuquerque, for Amici Curiae Association of Commerce and Industry et al.

Sanders & Westbrook, P.C., Duff Westbrook, Maureen A. Sanders, Albuquerque, Columbia Law School, Richard Briffault, New York, NY, for Amici Curiae New Mexico Municipal League et al.

Philip B. Davis, Albuquerque, for Amici Curiae Santa Fe Partnership for Social Justice et al.

## OPINION

FRY, J.

{1} Plaintiffs New Mexicans for Free Enterprise, the Santa Fe Chamber of Commerce, and several local business owners challenge an ordinance enacted by the City of Santa Fe mandating certain city-based businesses to pay a minimum wage higher than the current state and federal minimum hourly wage. Plaintiffs contend that the ordinance is beyond the power of a home rule municipality to enact and that the state minimum wage law preempts local policymaking in this area. Further, Plaintiffs argue that the ordinance is a taking of private property and that the ordinance's exemption for small businesses violates equal protection guarantees. Finally, Plaintiffs seek to have the ordinance struck down because the City failed to follow its own rules in passing the ordinance and the trial court abused its discretion in regulating discovery for expert testimony at trial. We conclude that a home rule municipality may set a minimum wage higher than that required by the state Minimum Wage Act, NMSA 1978, §§ 50–4–19 to –30 (1955, as amended through 2003), because of the independent powers possessed by municipalities in New Mexico and the absence of any conflict with state law. Unpersuaded by Plaintiffs' other arguments, we therefore affirm the district court's ruling that the minimum wage ordinance is within the power of the City to enact and is otherwise constitutional.

## BACKGROUND

{2} The significant facts in this case are those surrounding the processes by which the City passed the ordinance as well as the particular provisions of the ordinance. In 2002, the City passed the first version of the ordinance setting a minimum wage above that of the federal and state minimum wages for its own workers, contractors doing substantial business with the City, and other businesses directly receiving city benefits. Santa Fe, N.M., Wage Requirements: Minimum Wage Payment Requirements, ch. XXVIII, § 1.5 (2003). The City also established a Living Wage Roundtable that was directed to "explore and develop" an amendment to the 2002 ordinance that would mandate a living wage for the entire city. The Roundtable reviewed a substantial amount of information regarding local wages, cost of living, the daily challenges faced by both workers and employers in Santa Fe, and the costs and benefits of minimum wage requirements. The Roundtable consisted of nine members representing both labor and business management.

{3} The Roundtable presented majority and minority recommendations to the city council, with management members writing the minority report. The majority recommended, among other things, amending the ordinance to impose minimum wage requirements on all employers citywide, except those with fewer than ten employees. The majority also recommended that there be no credits for employer-provided benefits and that tips be excluded from the wage calculation. The minority, on the other hand, recommended further study to determine the potential impact to the Santa Fe economy and unemployment prior to any further action.

{4} The city council then held public hearings on the amended ordinance proposed by the Roundtable majority, and received input from over 150 speakers on both sides of the issue. Several economists provided input on the impact minimum wage increases would have upon the local economy, businesses, and workers. One economist represented to the city council that the federal and state minimum wage has declined significantly in real dollars.

{5} The council and the Roundtable both had information detailing the Santa Fe employment scene, including figures of how many low-wage workers worked in particular businesses. Early versions of the amended ordinance excluded small businesses, which

they defined as those employing fewer than ten workers. On the night that the council was to vote on the amendments to the ordinance, the council expanded the small business exemption by requiring compliance by only those businesses with twenty-five or more workers. The councilor making the proposal noted that expanding the exemption for small businesses would approximately cut in half the number of private businesses impacted while reducing the percentage of Santa Fe low-wage workers benefitting from the higher wage from around 75 percent to around 58 percent.

{6} The amendments to the ordinance passed by a vote of seven to one. The ordinance as amended requires for-profit businesses or non-profit entities that are registered or licensed in Santa Fe and that employ twenty-five or more workers (either full-time or part-time) to pay a minimum hourly wage of $8.50. *Id.* § 1.5(A)(4), (C). This wage increases to $9.50 in 2006 and to $10.50 in 2008; thereafter, the hourly wage is to be increased in tandem with increases in the Consumer Price Index. *Id.* § 1.5(B). Employers receive an hourly wage credit for employer-provided health care and childcare. *Id.* § 1.5(B). Tips are included in the wage calculation if the employee customarily receives at least $100 per month in tips. *Id.* The ordinance made a violation of its terms a misdemeanor and included provisions for enforcement by the city manager as well as by private, civil actions against an employer. Santa Fe, N.M., Wage Requirements: Enforcement; Remedies ch. XXVIII, § 1.8 (2003).

{7} In passing the amendments to the ordinance, the council issued legislative findings, including a finding that many workers in Santa Fe earn wages insufficient to support themselves and their families and that the community bore the burden when workers could not meet basic needs such as housing, food, shelter, and health care. Santa Fe, N.M., Wage Requirements: Legislative Findings ch. XXVIII, § 1.2(B), (H) (2003). The council also found that the cost of living in Santa Fe is 18 percent higher than the national average, while average earnings in Santa Fe are 23 percent below the national

average. *Id.* § 1.2(E). In finding that Santa Fe housing is substantially more expensive than in most of New Mexico and that low-wage workers must spend a disproportionate portion of their income for housing in Santa Fe, the city council concluded:

A. The public welfare, health, safety and prosperity of Santa Fe require wages and benefits sufficient to ensure a decent and healthy life for workers and their families.

. . . .

D. Minimum wage laws promote the general welfare, health, safety and prosperity of Santa Fe by ensuring that workers can better support and care for their families through their own efforts and without financial governmental assistance.

. . . .

I. It is in the public interest to require certain employers benefiting [sic] from city actions and funding, and from the opportunity to do business in the city, to pay employees a minimum wage, a "living wage[,]" adequate to meet the basic needs of living in Santa Fe.

*Id.* § 1.2(A), (D), (I)

{8} The City, which is a home rule municipality, recited two bases for the authority to pass the ordinance: (1) the powers given to home rule municipalities by the section of our constitution which we will refer to as the "home rule amendment," N.M. Const. art. X, § 6, and the Municipal Charter Act, NMSA 1978, §§ 3–15–1 to –16 (1965, as amended through 1990); and (2) the police and general welfare powers delegated by the legislature to all municipalities by NMSA 1978, §§ 3–17–1 to –7 (1965, as amended through 2003) and §§ 3–18–1 to –31 (1965, as amended through 2003). Santa Fe, N.M., Wage Requirements: Authority of the City of Santa Fe ch. XXVIII, § 1.3.

{9} Opponents of the ordinance filed suit in district court. The district court granted summary judgment for the City on several of Plaintiffs' claims, including a claim that the Minimum Wage Act preempts the ordinance. The issues remaining for trial were that the ordinance violates (1) the home rule amendment, (2) equal protection guarantees of the

New Mexico Constitution, (3) procedural due process, (4) eminent domain principles, and (5) the City's own procedural requirement to conduct a fiscal impact study. After a week-long trial devoted primarily to the eminent domain issue, the district court rejected each of Plaintiffs' claims and held the ordinance to be effective on the date of its decision. Plaintiffs timely appealed. Both the district court and this Court denied Plaintiffs' motions to stay the ordinance during the pendency of this appeal; therefore, Santa Fe employers with more than twenty-five workers are currently required to comply with the ordinance.

## DISCUSSION

{10} Plaintiffs make several arguments, which we categorize into four areas: (1) violation of municipal powers, (2) violation of equal protection and eminent domain principles, (3) illegal rate-making, and (4) procedural errors by the City in enacting the ordinance and by the district court at trial.

## I. MUNICIPAL POWER AND THE PRIVATE LAW EXCEPTION

{11} Our task is to effectuate the allocation of power between state and local government as articulated in the home rule amendment. The question presented by Plaintiffs as to the power possessed by home rule municipalities involves interpretation of both a constitutional amendment and statutes. Interpretation of statutes and constitutional amendments involves questions of law that an appellate court reviews de novo. *See City of Albuquerque v. Sachs*, 2004–NMCA–065, ¶ 9, 135 N.M. 578, 92 P.3d 24 (describing de novo review for interpretation of constitutional amendment). "Interpretation of constitutional clauses begins with the language of the text." *State v. Lynch*, 2003–NMSC–020, ¶ 15, 134 N.M. 139, 74 P.3d 73. "Where the constitutional clause is clear and unambiguous on its face, courts will not construe the clause." *Id.; State v. Cleve*, 1999–NMSC–017, ¶ 7, 127 N.M. 240, 980 P.2d 23 (stating standard of review for statutes), *modified on other grounds as recognized by State v. Perea*, 2001–NMCA–002, ¶ 10, 130 N.M. 46, 16 P.3d 1105. If the meaning of a clause is not clear, by virtue of having more

than one fair and reasonable interpretation, then we may consider history and context to shed light on the terms used and to ascertain the will of the people. *Flaska v. State*, 51 N.M. 13, 18, 177 P.2d 174, 177 (1946). We construe statutes similarly, beginning with the language, resorting to other sources when necessary, and ultimately seeking to determine and give effect to the intent of the legislature. *State v. Smith*, 2004–NMSC–032, ¶¶ 8–10, 136 N.M. 372, 98 P.3d 1022.

{12} We begin by briefly summarizing the nature of municipalities in New Mexico. We then consider whether the City was authorized to pass the ordinance. *See City of Hobbs v. Biswell*, 81 N.M. 778, 781, 473 P.2d 917, 920 (Ct.App.1970) (noting that the question of municipal authority to act is a separate inquiry from the determination of conflict with state law). Finally, we determine whether the ordinance impermissibly conflicts with state law. § 3–17–1 (stating that municipalities may adopt ordinances as long as they are "not inconsistent with the laws of New Mexico").

## A. THE NATURE OF MUNICIPALITIES

{13} Municipalities, as units of local government, come into existence by the process of incorporation under the Municipal Act. *See* NMSA 1978, §§ 3–2–1 to –9 (1965, as amended through 1999). They are subordinate to the state government. *City of Albuquerque v. N.M. Pub. Regulatory Comm'n*, 2003–NMSC–028, ¶ 3, 134 N.M. 472, 79 P.3d 297 (stating that "[a] municipality is an auxiliary of the state government" (internal quotation marks and citation omitted)). All municipalities have been granted certain powers by the legislature, including the so-called general welfare and police powers, as set out in Sections 3–17–1(B) and 3–18–1(F), (G) respectively. Municipalities may adopt ordinances as long as they are "not inconsistent with the laws of New Mexico." § 3–17–1.

{14} A municipality may become a home rule municipality by adopting a charter under the Municipal Charter Act, NMSA 1978, §§ 3–16–1 to –18 (1965) and N.M. Const. art. X, § 6(C). There are two bene-

fits of becoming a home rule municipality. The first benefit is a generous grant of authority by the home rule amendment, which gives the municipality blanket authority to act as long as the legislature has not expressly denied that authority. *State ex rel. Haynes v. Bonem*, 114 N.M. 627, 631, 845 P.2d 150, 154 (1992). Second, home rule municipalities have a limited form of autonomy from state interference in matters of local concern. *Id.* at 634, 845 P.2d at 157 (explaining that "the purpose of our home rule amendment is to delegate to municipalities autonomy in matters concerning their local community"). Because Santa Fe is a home rule municipality, we turn next to a more detailed examination of the authority granted by the home rule amendment and the limitations on that authority.

## B. THE CITY'S POWER TO ADOPT THE ORDINANCE

{15} New Mexico adopted its current version of home rule in 1970 by constitutional amendment. *Id.* at 630, 845 P.2d at 153; *see also N.M. Mun. League, Home Rule Manual for N.M. Municipalities*, ch. II, § 7–12 (1976) (tracing the history of home rule in New Mexico). Home rule "was to enable municipalities to conduct their own business and control their own affairs, to the fullest possible extent, in their own way ... upon the principle that the municipality itself knew better what it wanted and needed than did the state at large." *Apodaca v. Wilson*, 86 N.M. 516, 520, 525 P.2d 876, 880 (1974) (internal quotation marks and citation omitted), *modified on other grounds as recognized in Bonem*, 114 N.M. 627, 845 P.2d 150. "[I]n New Mexico, ... a home rule municipality no longer has to look to the legislature for a grant of power to act, but only looks to legislative enactments to see if any express limitations have been placed on their power to act." *Apodaca*, 86 N.M. at 521, 525 P.2d at 881. The home rule amendment, in pertinent part, states:

> D. A municipality which adopts a charter may exercise all legislative powers and perform all functions not expressly denied by general law or charter. This grant of powers shall not include the power to enact private or civil laws governing civil rela-

tionships except as incident to the exercise of an independent municipal power.

> E. The purpose of this section is to provide for maximum local self-government. A liberal construction shall be given to the powers of municipalities.

N.M. Const. art. X, § 6(D), (E)

{16} By its phrase "may exercise all legislative powers and perform all functions not expressly denied," the home rule amendment was clearly intended to devolve onto home rule municipalities remarkably broad powers. In addition, the express purpose and liberal construction clauses make clear that the home rule amendment is intended to provide chartered municipalities with the utmost ability to take policymaking initiative. *See Home Rule Manual for N.M. Municipalities*, ch. III, § 17 (noting that New Mexico's home rule provision is "probably among the more liberal in the nation" in terms of granting power to municipalities).

{17} But there are limits to this power. The exercise of municipal power cannot be "expressly denied by general law," and the so-called private law exception bars a home rule municipality from "enact[ing] private or civil laws governing civil relationships except as incident to the exercise of an independent municipal power." N.M. Const. art. X, § 6(D). We consider each limitation in turn.

### 1. THE MINIMUM WAGE ACT IS A "GENERAL LAW"

{18} The Minimum Wage Act is a law that might conceivably deny the City's power to enact the ordinance because both the Minimum Wage Act and the ordinance have the same subject matter. Therefore, in order to determine whether the City's power is "expressly denied by general law," the first step is to determine whether the Minimum Wage Act is a general law. A general law "applies generally throughout the state, or is of statewide concern as contrasted to 'local' or 'municipal' law." *Haynes*, 114 N.M. at 631, 845 P.2d at 154 (internal quotation marks and citation omitted). A general law impacts all inhabitants of the state rather than just the inhabitants of a municipality. *Id.* at 633, 845 P.2d at 156. Specifically, in

determining whether the Minimum Wage Act is a general law, we consider whether there is statewide concern that the law set a minimum wage. We think an hourly minimum wage is of obvious concern to workers across the state and it applies to all workers in the state. Thus, we conclude, as the district court did, that the Minimum Wage Act is a general law because it applies generally throughout the state, relates to a matter of statewide concern, and impacts workers across the entire state.

## 2. THE MINIMUM WAGE ACT DOES NOT EXPRESSLY DENY THE CITY'S POWER TO ENACT THE ORDINANCE

{19} We next consider whether the general law "expressly denies" the City's power to enact a higher minimum wage applicable municipally. This involves an inquiry into whether the Minimum Wage Act evinces any intent to negate such municipal power, whether there is a clear intent to preempt that governmental area from municipal policymaking, or whether municipal authority to act would be so inconsistent with the Minimum Wage Act that the Minimum Wage Act is the equivalent of an express denial. *Id.* at 634, 845 P.2d at 157 (summarizing the manner in which express denial may occur); *see also ACLU v. City of Albuquerque*, 1999–NMSC–044, ¶¶ 10, 13, 128 N.M. 315, 992 P.2d 866 (holding that the comprehensive Children's Code contained an "express statement of the authority or power denied that is necessary to preempt a home-rule ordinance" because a city criminal curfew ordinance would frustrate and circumvent the intent of the general law (interal quotation marks and citation omitted)); *Casuse v. City of Gallup*, 106 N.M. 571, 573, 746 P.2d 1103, 1105 (1987) (stating that "any New Mexico law that clearly intends to preempt a governmental area should be sufficient" to do so).

{20} Plaintiffs contend that the Minimum Wage Act expresses a policy "tantamount to [a] denial" based primarily on one word in the declaration of public policy in the Minimum Wage Act. That portion of the Minimum Wage Act states that the act is "to

establish minimum wage and overtime compensation standards for *all* workers." § 50–4–19 (emphasis added). We disagree. The Minimum Wage Act's application to "all" workers simply means that the minimum wage is intended to set an hourly wage floor for all workers—it does not express that the *only* permissible minimum wage is that set by the Minimum Wage Act, it does not imply any preemption of this area, and it does not grant comprehensive authority to set minimum wages to the state such that municipal action would be inconsistent with state policy. *See Haynes*, 114 N.M. at 634, 845 P.2d at 157 (exploring preemption of municipal lawmaking by asking whether state law embodies any intent to preempt, any single statewide scheme, or any grant of authority to another governmental body). We note that, unlike the situation in *ACLU*, state law does not establish any type of comprehensive wage-setting program or scheme and the Minimum Wage Act does not exhaustively address the subject of minimum wages. *ACLU*, 1999–NMSC–044, ¶¶ 13, 15, 128 N.M. 315, 992 P.2d 866 (describing how the Children's Code, by "comprehensively" and "exhaustively" addressing behavior by children that would be criminal but for the offender's age, preempted a municipal ordinance attempting to criminalize children's behavior). In addition, unlike the situation in *In re Generic Investigation into Cable Television Services*, 103 N.M. 345, 351, 707 P.2d 1155, 1161 (1985), there is neither a constitutional nor statutory grant of authority to another governmental body over the regulation of wages that would make a municipal action so inconsistent with the Minimum Wage Act that it would be equivalent to an express denial.

{21} Moreover, in passing the Minimum Wage Act, the legislature allowed any existing local minimum wage ordinances that were more favorable to employees to stay in effect. § 50–4–29. Plaintiffs contend that by reading this section together with the policy that the Minimum Wage Act applies to "all workers," then "it is clear that the legislature intended that no other governmental entities adopt their own wage laws." Plaintiffs contend these sections are tantamount to an express denial of municipal authority. We

do not agree that any preemption is suggested by these two sections. To the contrary, we view this recognition of existing ordinances setting higher local wages as expressly contemplating a lack of uniformity, which cuts against any intent to preempt or deny municipal power in setting minimum wages.

{22} We conclude that municipal power to set a minimum wage higher than that of the Minimum Wage Act is not "expressly denied by general law" within the meaning of the home rule amendment. We next consider the exception within the home rule amendment that the broad grant of powers to home rule municipalities "shall not include the power to enact private or civil laws governing civil relationships" and then the exemption that allows such a private or civil law when it is "incident to the exercise of an independent municipal power." We refer to these as the private law exception and the independent power exemption, respectively.

## 3. THE ORDINANCE IS A PRIVATE OR CIVIL LAW

{23} Plaintiffs contend that the ordinance is a private or civil law governing the civil relationship of employer and employee because it "seeks to establish legal duties between private businesses and their private employees, and it establishes a new cause of action against private businesses that do not pay the wage." We agree. While there are no bright-line divisions between public law and private law, Terrrance Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts*, 48 Minn. L.Rev. 643, 674 [hereinafter Sandalow], private law has been defined as consisting "of the substantive law which establishes legal rights and duties between and among private entities, law that takes effect in lawsuits brought by one private entity against another." Gary T. Schwartz, *The Logic of Home Rule and the Private Law Exception*, 20 UCLA L.Rev. 671, 688 [hereinafter Schwartz] (internal footnotes omitted). That definition certainly applies to the ordinance, which sets a mandatory minimum wage term for labor contracts between private parties that the employee may enforce by bringing a civil action against the employer. The fact that the city admin-

istrator may punish violation of the ordinance as a misdemeanor does not convert the ordinance into "public law" nor does it alter the basic nature of the ordinance, which is to set and enforce a key contract term between private parties. *See Marshal House, Inc. v. Rent Review & Grievance Bd. of Brookline,* 357 Mass. 709, 260 N.E.2d 200, 206 (1970) (noting that public enforcement is not dispositive of the private law nature of an ordinance). The relationship between private employer and employee has been described as a civil relationship because it is governed by the civil law of contracts. *See New Orleans Campaign for a Living Wage v. City of New Orleans,* 02–0991 at p. 11, 825 So.2d at 1117 (Weimer, J., concurring) (concluding that a private employee-employer relationship is both a private and civil relationship and that a minimum wage ordinance is attempting to regulate that relationship). We conclude that the ordinance is a private or civil law governing civil relationships within the meaning of the home rule amendment.

## 4. THE ORDINANCE IS WITHIN THE INDEPENDENT POWERS EXEMPTION

{24} Although the ordinance is a private law, nonetheless the home rule amendment permits a municipality to enact such a law if it is "incident to the exercise of an independent municipal power." N.M. Const. art. X, § 6(D). Both commentators and courts have noted the ambiguity of this independent power exemption. For example, Professor Schwartz observed that while its "precise legal meaning can be questioned ... [it] clearly attempts to express the idea that cities have a substantial stake in private law insofar as that law may advance or support the cities' 'independent' (i.e. public law) programs or enactments." Schwartz, *supra,* at 718 (internal footnote omitted).

{25} Also noting the vagueness of the private law exception overall, the Massachusetts Supreme Judicial Court held in *Marshal House, Inc.* that for an ordinance to fall within the independent power exemption, a municipality must point to an "individual component of the municipal police power" that provides it authority to act; otherwise,

the private law exception might have "a very narrow range of application." 260 N.E.2d at 206–07. The court held that the municipality failed to do this in connection with a provision establishing a rent-control and review board. The court rejected the municipality's claims that its objective in controlling rents was to provide for the public welfare. *Id.* While the court recognized the link between affordable housing and the public welfare, it stated that "[r]ent control, however, is also an objective in itself designed to keep rents at reasonable levels." *Id.* at 206. The court held that "it would be, in effect, a contradiction (or circuitous) to say that a by-law the *principal objective . . .* of which is *to control rent payments,* is also merely incidental to the exercise of an independent municipal power to control rents." *Id.* at 207 (emphasis added).

{26} Plaintiffs urge us to follow *Marshal House, Inc.* by requiring that the City point to an "individual component" of its police power providing the power to pass the ordinance. We decline to adopt the reasoning in *Marshal House, Inc.* for two reasons. First, the court in that case provided a specious answer to the question "What is the object of the regulation?" by concluding the object was "to control rent payments." There, the stated "principal objective" of the municipality was not to control rent payments as an end itself, but to provide for the general health and welfare of residents by providing sufficient affordable housing. Second, because New Mexico municipalities have been delegated a generic police and general welfare power, we think that forcing a municipality to point to an "individual component" of its police power puts an unduly restrictive gloss on the exemption and reads words into the home rule amendment that are not there.

{27} The exemption refers to an "independent municipal power," which we conclude means any power other than home rule. There is no indication in the phrase "independent municipal power" that such a power must be in some way particularized or tailored; as long as there is a power granted by the legislature that is independent from home rule power, that is enough. We take the view that as long as a municipality can point to a power that the legislature has delegated to it, and the regulation of the civil relationship is reasonably incident to, and clearly authorized by that power, the exemption can apply.

{28} The only additional limitation on a municipality's power, which we have gleaned from the commentators, is the need for uniformity that informs any consideration of the private law exception and independent powers exemption. *See* Howard McBain, *The Law and the Practice of Municipal Home Rule* (1916) 673 (noting that, "[b]y common understanding such general subjects as crime, domestic relations, wills and administration, mortgages, trusts, contracts, real and personal property, insurance, banking, corporations and many others have never been regarded by any one, least of all by the cites themselves, as appropriate subjects of local control"); Schwartz, *supra,* at 720–47 (proposing three underlying rationales for the private law exception, including "the need to retain uniformity in private law"); Sandalow, *supra,* at 678–79 (stating that "chaos would ensue" if all home rule municipalities could "adjust contract, property and the host of other legal relationships between private individuals"). Given this concern for uniformity, we conclude there are two prerequisites to a municipality's regulation of a civil relationship. Where a municipality has been given powers by the legislature to deal with the challenges it faces, those may be sufficiently independent municipal powers to allow regulation of a civil relationship as long as (1) the regulation of the civil relationship is reasonably "incident to" a public purpose that is clearly within the delegated power, and (2) the law in question does not implicate serious concerns about non-uniformity in the law. This rule allows a home rule municipality to regulate a civil relationship as far as necessary within its delegated powers to address local public concerns, while preventing the harm at which the private law exception is primarily aimed. *See* Schwartz, *supra,* at 752 (stating "[h]avoc would be occasioned if city corporation codes and blue sky ordinances were enforced against corporations which engage in operations or sell securities throughout the state or nation"). *See also*

*City of Baltimore v. Sitnick,* 254 Md. 303, 255 A.2d 376, 384 (Md.1969) (concluding that unique local conditions, such as higher cost of living and housing problems, justified additional city regulation of the minimum wage). This rule is also sufficiently flexible to allow a fact-intensive evaluation of any given municipal action by balancing the municipality's pursuit of the public interest to address local issues against the need for stability and uniformity in the law across the state. *See* Schwartz, *supra,* at 747 (describing some non-uniformity as "a price we willingly pay in order to achieve the benefits of local democracy"). This rule is consistent with the home rule amendment and Municipal Code, both of which provide for liberal construction in favor of granting power to cities for a "maximum local self-government." N.M. Const. art. X, § 6(E); § 3–15–13(B) (repeating this rule of construction).

{29} In light of this holding, we apply the rule and evaluate (1) whether the ordinance's regulation of the civil relationship is reasonably "incident to" a public purpose that is clearly within the legislature's delegation of specific, independent powers, and (2) whether the ordinance implicates serious concerns about non-uniformity in the law. With respect to public purpose within a municipality's delegated powers, the legislature has given all municipalities the power to provide for the general welfare of their residents by the general welfare clause in Section 3–17–1(B). In addition, the legislature has given all municipalities the police power to "protect generally the property of its municipality and its inhabitants" and to "preserve peace and order within the municipality" by Section 3–18–1(F) and (G). While these are separate powers, they may be treated as one. *Biswell,* 81 N.M. at 780, 473 P.2d at 919 (stating that these two powers "if independent of one another, tend to merge"). We consider these powers to be independent municipal powers within the meaning of the home rule amendment because they are powers delegated to municipalities completely independent from the home rule amendment.

{30} The connection between wages and the general welfare of workers is well established in American jurisprudence and is clearly within the police power of a state to regulate. *Rui One Corp. v. City of Berkeley,* 371 F.3d 1137, 1150 (9th Cir.2004) (stating that "[t]he power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power"); *New Orleans Campaign for a Living Wage,* 02–0991, at p. 13, 825 So.2d at 1098 (affirming that the power to set a minimum wage is an exercise of the police power); *City of Baltimore,* 255 A.2d at 378 (holding that a municipality has authority to establish a minimum wage under its police powers). In *West Coast Hotel Co. v. Parrish,* 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), the United States Supreme Court upheld against a freedom of contract challenge a state court decision that the police power of the state permitted setting a minimum wage. *Id.* at 413–14, 57 S.Ct. 578. The Court concluded that wages insufficient to support basic needs are a public problem due to the impact on the entire community. *Id.* at 399, 57 S.Ct. 578. This conclusion was presaged by Justice Stone's dissent in *Morehead v. New York ex rel. Tipaldo,* 298 U.S. 587, 56 S.Ct. 918, 80 L.Ed. 1347 (1936), *overruled on other grounds by Olsen v. Nebraska ex rel. W. Reference & Bond Ass'n, Inc.,* 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305, (1941) when he noted:

> We have had opportunity to perceive more clearly that a wage insufficient to support the worker does not visit its consequences upon him alone; that it may affect profoundly the entire economic structure of society and, in any case, that it casts on every taxpayer, and on government itself, the burden of solving the problems of poverty, subsistence, health and morals of large numbers in the community. Because of their nature and extent these are public problems.

*Morehead,* 298 U.S. at 635, 56 S.Ct. 918 (Stone, J., dissenting). Given this authority, we conclude that setting a minimum wage is unquestionably a public purpose and that such legislation is within the police and general welfare power of a New Mexico municipality.

{31} As to whether the City is acting incident to the exercise of an independent

municipal power, there is little conclusive authority on the subject. In *Marshal House, Inc.*, the court held that regulating the landlord-tenant relationship by setting the rental price term was a direct, rather than incidental, regulation of the relationship, yet it would have allowed regulation of the relationship for safety or health codes, such as fire prevention or hallway lighting, which it viewed as incidental to the police power. 260 N.E.2d at 206.

{32} The rationale of *Marshal House, Inc.*, appears to allow comparatively minor intrusions by an ordinance into a civil relationship, but bars greater intrusions. Yet we fail to see how regulating a private relationship in terms of health and building safety codes is "indirect" while regulating a more central or important aspect, such as the rental term in *Marshal House, Inc.*, is "direct." Such a principle would lead to arcane inquiries into the relative importance of different aspects of an agreement. Is building safety or rent more important to the landlord-tenant relationship? Is worker health and safety less critical than wages or hours? We read "incident to an exercise of an independent municipal power" as simply limiting the circumstances in which a municipality may pass a private or civil law, not as barring certain types of private or civil law or limiting the degree of their intrusion into the relationship. *Id.* We conclude that as long as the intrusion into the private relationship is in pursuit of the public interest and clearly within the independent municipal power, that is sufficient to permit the municipality to pass a private or civil law regulating that relationship as long as the law does not generate non-uniformity issues. We focus on whether there is a public purpose or objective for the exercise of the independent municipal power. Here, there clearly is a public purpose as described by the myriad authorities holding that a minimum wage protects the general welfare of the community.

{33} Amicus Association of Commerce and Industry of New Mexico, echoing the reasoning in *Marshal House, Inc.*, argues that the City's regulation of wages is "both the specific purpose and the direct result" of the power to enact private law. We dis-

agree. The object of this legislation is not to regulate private wages as an end in itself or to set comprehensive "reasonable wages" in the City, but rather to provide for the general welfare of workers and taxpayers in the City. The City has thus pursued a public program to ensure that workers can meet their basic needs and avoid becoming a burden on the community. The City is in no way singling out private employers or burdening them as an end in itself. The ordinance is analogous to many types of other health and safety ordinances that may impact private and civil relationships, but which are aimed at the health, welfare, or safety of renters, workers, or consumers. *See, e.g.,* Santa Fe, N.M., Environmental Regulations: Prohibition of Smoking ID Places of Employment ch. X, § 6.6 (1999) (mandating that private employers in the city provide a smoke-free workplace); Santa Fe, N.M., Fair Housing: Discrimination in Sales or Rental of Housing ch. VII, § 14.8 (1999) (prohibiting discrimination in the sale or rental of private housing within the city); Santa Fe, N.M., Environmental Regulations: Premises to be Free from Litter and Refuse ch. X, § 1.14 (requiring private property owners to keep their premises free of litter and refuse).

{34} We now turn to the second prong of the rule permitting regulation of a civil relationship and consider whether the ordinance seriously implicates concerns about non-uniformity. Commentators and courts have expressed concern about home rule municipalities creating a patchwork quilt of law that would hamper business transactions and unfairly upset parties' expectations, and we have concluded that this is the primary evil at which the private law exception is aimed. We view the inquiry, then, as whether the ordinance disrupts or confuses New Mexico law to an unacceptable degree.

{35} The nature of the ordinance is central in determining whether it implicates serious concerns about non-uniformity. For example, substantial disorder and confusion would result if the City rejected the Uniform Commercial Code, adopted a contributory negligence regime, or if it imposed heightened burdens on corporate boards of directors for companies doing business in the

City. Leaving aside potential conflicts with state law (which will often bar such local laws), these types of private or civil law changes would frustrate and confuse even the most diligent consumer, businessperson, or lawyer. Those contracting with city parties, corporations doing business there, or those injured by tortfeasors in the City would have little reason to know of these special rules and each would cause notice, compliance, and choice of law issues. Our task is to determine whether such issues are so pervasive that the ordinance disrupts or confuses New Mexico law.

{36} Here, the ordinance does not raise serious concerns about non-uniformity in the way that any of the prior examples would. Any concerns about inefficiency in terms of high notice and compliance costs are allayed by the limited application of the ordinance— it applies only to employers who are registered or licensed in the City. We presume that those entities with more than twenty-five employees seeking city business licenses are doing so purposefully (and with at least some deliberation), and we doubt that they are unaware of such a high-profile ordinance. In addition, the burden on a regional or national business of discovering and applying a higher wage for city workers is modest at most. Presumably, extra-local businesses can identify their own locations and workers licensed in the City and set their hourly wage.

{37} Given modern technology and administration, the cost of discovering and complying with the City's law is minimal. We would be much more concerned if the City were attempting to set a minimum wage term for any contracts for labor "entered into" within the City or for any "labor provided" in the City. Such provisions would raise more serious questions regarding the cost of discovering and complying with the ordinance and the overall disruption of employment contract terms. See Madison, Wisc., Officials, Boards, Employees, & Public Records ch. 3, § 3.45(2)(k), abrogated by, Wis. Stat. Ann. § 104.001(2) (2005) (setting a living wage above the state minimum wage, and defining the term "employee" to mean anyone who "performs at least two hours of compensable work" per calendar week to any employer in Madison). In light of the ordinance's requirements, we doubt that the ordinance will generate confusion in the law of contracts in New Mexico, produce great inefficiency among the businesses that are required to comply with the ordinance, or cause choice of law problems. Thus, the ordinance does not implicate any serious concerns about generating non-uniformity in New Mexico law.

{38} We emphasize that our conclusion is informed by the circumstances of this case, in which the City has made a showing that it was addressing a serious local problem and where the particular regulation of the employer/employee relationship has long been considered a reasonable exercise of the police power. Were a home rule municipality to enact a private or civil law regulating a civil relationship at the borders of its delegated powers, clearly engaging in overreaching, or implicating substantial non-uniformity issues, we think a different result could obtain. We disagree with Plaintiffs' contention that allowing a home rule municipality to rely on its police power to enact private or civil law governing civil relationships would render the private law exception in the home rule amendment "meaningless." We conclude that our construction is a straightforward application of the language in the home rule amendment as well as consistent with the model version of the private law exception. American Municipal Association: Model Constitutional Provisions for Municipal Home Rule, 21, at cmt. 5 (1953) (stating that "[i]t is the theory of the draft that a proper balance can be achieved by enabling cities to enact private law only as an incident to the exercise of some independent municipal power").

## C. NO INCONSISTENCY WITH STATE LAWS

{39} Deciding that the City has the authority to enact a minimum wage regulation under the home rule amendment is not the end of the inquiry; we must finally determine whether the ordinance is inconsistent with state law. See Biswell, 81 N.M. at 782, 473 P.2d at 921 (noting that the question of

municipal authority to act is a separate inquiry from the determination of conflict with state law); § 3–17–1 (stating that "[t]he governing body of a municipality may adopt ordinances or resolutions not inconsistent with the laws of New Mexico"). While this inquiry is similar to the discussions above regarding whether the Minimum Wage Act expressly denies legislative power to the City and whether the ordinance implicates non-uniformity concerns, we believe separate treatment of inconsistency is justified. In *State ex rel. Coffin v. McCall,* 58 N.M. 534, 537, 273 P.2d 642, 644 (1954), our Supreme Court articulated the test for determining whether an inconsistency exists as "whether the ordinance permits an act the general law prohibits, or vice versa." *See Bd. of Comm'rs of Rio Arriba County v. Greacen,* 2000–NMSC–016, ¶ 16, 129 N.M. 177, 3 P.3d 672 (explaining that *McCall* was evaluating inconsistency and applying this test to determine whether an ordinance conflicted with state law); *Biswell,* 81 N.M. at 783, 473 P.2d at 922 (applying the test from *McCall* to determine inconsistency under the identical predecessor statute to Section 3–17–1). If an ordinance merely complements a statute, instead of being "antagonistic" to it, it is not in conflict with state law. *McCall,* 58 N.M. at 538, 273 P.2d at 644. Where an ordinance is more strict than a state law, it is effective unless it conflicts with state law. *Gould v. Santa Fe County,* 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122, *overruled on other grounds by Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n,* 2003–NMSC–005, 133 N.M. 97, 61 P.3d 806. "The analysis to apply is whether the stricter requirements of the ordinance conflict with state law, and whether the ordinance permits an act the general law prohibits, or prohibits an act the general law permits." *Gould,* 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122 (internal quotation marks omitted).

{40} Amicus Association of Commerce and Industry argues that the ordinance prohibits an act which the state law permits, because state law purportedly "permits" certain city employers to pay their workers a wage of $5.15 per hour, while the ordinance does not. We are not persuaded. We note that our courts have not mechanically applied this test for the existence of a conflict where state and local law both touch upon the same subject matter. *McCall,* 58 N.M. at 538, 273 P.2d at 644 (holding that a local DWI ordinance was simply complementary to, and not in conflict with state DWI law, because it was not antagonistic to the state law). For example, in *Biswell,* we considered an ordinance that imposed a higher burden than state law on local pawnbrokers ·because it required pawnbrokers to permit inspection of records by not only police officers, but by others, such as city commissioners. 81 N.M. at 779, 473 P.2d at 918. We held that the ordinance was not in conflict with state law because the state law did not prohibit "inspection by other than police officers." 81 N.M. at 783, 473 P.2d at 922. The state law did not "permit" pawnbrokers to keep their records secret from all but police officers, and therefore the more stringent local ordinance did not "prohibit" an activity permitted by state law. *See also Gould,* 2001–NMCA–107, ¶ 18, 131 N.M. 405, 37 P.3d 122 (holding that a local ordinance that was more strict than state law was not in conflict with state law).

{41} Courts do not apply this test for conflict in a wooden manner because doing so would lead to absurd results. For example, where state law is silent on smoking in public places, that silence likely would not be deemed permission by state law such that a municipality could never restrict smoking in public places. Were that the test, municipalities would effectively lose much of their ability to regulate. *People v. Cook,* 34 N.Y.2d 100, 356 N.Y.S.2d 259, 312 N.E.2d 452, 457 (1974) (stating that where state law is silent, it is not permitting activity and "[t]his statement of the law is much too broad. If this were the rule, the power of local governments to regulate would be illusory").

{42} We agree with those authorities concluding that conflict with state law may be found when state law affirmatively or specifically permits an activity rather than when it is silent. *Jancyn Mfg. Corp. v. County of Suffolk,* 71 N.Y.2d 91, 524 N.Y.S.2d 8, 518 N.E.2d 903, 907–08 (1987); *see also N.Y. State Club Assoc., Inc. v. City of N.Y.,* 69 N.Y.2d 211, 513 N.Y.S.2d 349, 505

N.E.2d 915, 920 (1987) (noting that a state law "permits" activity so as to bar local regulation, only when it evidences an intent to preempt varying local regulations or "when the state *specifically* permits the conduct" that the locality bans (emphasis added)); *Wholesale Laundry Bd. of Trade, Inc. v. City of N.Y.,* 12 N.Y.2d 998, 239 N.Y.S.2d 128, 189 N.E.2d 623, 624 (1963) (Fuld, J., dissenting) (stating that a local law requiring a minimum wage higher than state law "neither prohibits what the [s]tate statute *affirmatively* permits nor permits what it prohibits" and that minimum wage acts are prohibitory, not permissive, such that a local law imposing higher standards is not inconsistent with state law (emphasis added)).

 {43} Like these authorities, we hold that an ordinance will conflict with state law when state law specifically allows certain activities or is of such a character that local prohibitions on those activities would be inconsistent with or antagonistic to that state law or policy. This is not the case here. The Minimum Wage Act sets a minimum hourly wage, prohibiting the payment of wages below $5.15 per hour. The Minimum Wage Act does not "permit" only its rate, and it does not establish any type of comprehensive wage scheme or express any need for uniformity. The City's ordinance does not allow an employer to pay less than this minimum but requires wages to be higher than this minimum. We view the Minimum Wage Act as setting only a wage floor that does not bar higher local minimum wage rates. *See Wilson Oil Co. v. Hardy,* 49 N.M. 337, 344, 164 P.2d 209, 213 (1945) (concluding that the purpose of the federal minimum wage is "to put a floor on wages,") *superseded by statute on other grounds as stated in, Witt v. Skelly Oil Co.,* 71 N.M. 411, 379 P.2d 61 (1963); *Gould,* 2001-NMCA-107, ¶ 18, 131 N.M. 405, 37 P.3d 122 (holding that ordinances more restrictive than state law are allowed as long as the two do not conflict); *see also City of Baltimore,* 255 A.2d at 385–86 (holding that city minimum wage requirement higher than state requirement only supplemented state law and that an exemption from a state requirement "amounts to no regulation at all" leaving the field open to local regulation). Thus, the ordinance is merely complementa-

ry to the Minimum Wage Act and is not antagonistic toward the Minimum Wage Act's policy of ensuring that all workers are paid a minimum of $5.15 per hour. Because we find that the ordinance is not in conflict with the Minimum Wage Act, under Section 3–17–1, the ordinance is not inconsistent with state law and is permitted.

{44} The legislature remains the ultimate check on home rule municipal policymaking when a subject is one of statewide concern. The legislature clearly knows how to preempt local lawmaking when it wants to do so. *See, e.g.,* NMSA 1978, § 29–11A–7 (2000, as amended by 2005 N.M. Laws ch. 279, p. 2735) (preempting the field of sex offender registration and barring any municipalities from legislating in this area, but allowing pre-existing ordinances to stand to the extent they impose greater registration requirements). Minimum wage policymaking is within the scope of municipal power unless the legislature clearly intends to remove it or when there is a conflict between an ordinance and general state law.

## II. CONSTITUTIONAL CHALLENGES: EQUAL PROTECTION AND EMINENT DOMAIN

 {45} Plaintiffs contend the ordinance violates the constitutional provisions ensuring equal protection and regarding eminent domain. We review constitutional challenges .to a statute de novo. *State v. Laguna,* 1999-NMCA-152, ¶ 24, 128 N.M. 345, 992 P.2d 896. City ordinances are treated no differently than statutes for purposes of judicial review. *See City of Albuquerque, ex rel. Albuquerque Police Dep't v. One (1) 1984 White Chevy UT.,* 2002-NMSC-014, ¶ 5, 132 N.M. 187, 46 P.3d 94 (reviewing constitutionality of city ordinance using rules regarding statutes).

A reviewing court begins its inquiry with a presumption that a statute is valid. A court must uphold a statute unless satisfied beyond a reasonable doubt that the legislature exceeded the bounds of the constitution in enacting it. All doubts as to its constitutionality must be resolved in favor of the validity of the law. A party chal-

lenging the constitutionality of a statute has the burden of establishing its invalidity.

*Deem v. Lobato,* 2004–NMCA–102, ¶ 20, 136 N.M. 266, 96 P.3d 1186 (internal quotation marks and citations omitted).

## A. EQUAL PROTECTION

{46} Plaintiffs argue that the small-business exemption in the ordinance violates the equal protection guarantee contained in Article II, § 18 of the New Mexico Constitution. "Like its federal equivalent, this is essentially a mandate that similarly situated individuals be treated alike, absent a sufficient reason to justify the disparate treatment." *Wagner v. AGW Consultants,* 2005–NMSC–016, ¶ 21, 137 N.M. 734, 114 P.3d 1050. We assume without deciding that the small business exemption results in similarly situated individuals being treated in a dissimilar fashion, particularly for those businesses that employ only slightly more or fewer than twenty-five employees. *See Breen v. Carlsbad Mun. Schs.,* 2005–NMSC–028, ¶ 10, 138 N.M. 331, 120 P.3d 413 (describing the "threshold question" in equal protection analyses "whether the legislation creates a class of similarly situated individuals who are treated dissimilarly"). Therefore, we turn to an identification of the level of scrutiny to be applied to the challenged law, which turns upon the "nature and importance of the individual interests asserted and the classifications created." *Wagner,* 2005–NMSC–016, ¶ 12, 137 N.M. 734, 114 P.3d 1050. Here, Plaintiffs concede that rational basis scrutiny applies because the ordinance does not impact or involve fundamental rights or suspect classifications, nor does it involve important rights or protected classes. *Trujillo v. City of Albuquerque,* 1998–NMSC–031, ¶¶ 26, 28, 125 N.M. 721, 965 P.2d 305 (applying rational basis scrutiny to economic or financial legislation and emphasizing that linedrawing in classification is a legislative function). This Court must make its own determination, de novo, which level of scrutiny is appropriate to apply in light of the "right or the nature of the group affected by the legislation." *Breen,* 2005–NMSC–028, ¶ 16, 138 N.M. 331, 120 P.3d 413. Because the ordinance does not restrict Plaintiffs'

ability to exercise an important right and because Plaintiffs are not part of a sensitive class, we agree with Plaintiffs that rational basis scrutiny applies. *Id.* ¶¶ 18, 19, 20 (describing sensitive classes as those groups subjected to societal prejudice or systematic denial from the political process).

{47} Minimum wage regulation is considered social and economic legislation. *See Rui One Corp.,* 371 F.3d at 1154. Ordinarily, we defer to the legislature's "judgment in enacting social and economic legislation." *Wagner,* 2005–NMSC–016, ¶ 12, 137 N.M. 734, 114 P.3d 1050. "To successfully challenge [a] statute under this [rational basis] standard of review, [the challenger] must demonstrate that the classification created by the legislation is not supported by a firm legal rationale or evidence in the record." *Id.* ¶ 24 (internal quotation marks and citation omitted).

{48} The ordinance's small-business exception excludes those employers who employ fewer than twenty-five workers, either full-time or part-time. Minimum Wage Payment Requirements ch. XXVIII, § 1.5(A)(4). Plaintiffs contend that the selection of the twenty-five employee cut-off is arbitrary and lacked sufficient foundation demonstrating any differences between large and small employers. Plaintiffs make much of the fact that the small-business exemption was increased from ten workers to twenty-five on the night the ordinance passed and contend that the City "literally plucked the numbers out of the air," thereby engaging in arbitrary selection rather than rational classification. We disagree. The councilor proposing the amendment stated that it was "designed to reduce the potential impact of this ordinance on 50 [percent] of the small businesses, i.e., from 19.7 percent to 9 percent," and she described the commensurate reduction in impact from 74.8 percent of employees down to 57.9 percent. She described this change as a "tradeoff" until an evaluation of the ordinance's impact on local employers was completed. We view this tradeoff as classic linedrawing in legislative policymaking. *See Trujillo,* 1998–NMSC–031, ¶ 28, 125 N.M. 721, 965 P.2d 305 (stating that linedrawing is a legislative function). *See also Williamson*

*v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (explaining that legislators may address only one area or aspect of a problem and neglect others without causing invidious discrimination).

{49} Plaintiffs rely heavily on language from *Burch v. Foy,* 62 N.M. 219, 224, 308 P.2d 199, 202 (1957), stating that

classification, in order to be legal, must be rational; it must be founded upon *real differences of situation or condition,* which bear a just and proper relation to the attempted classification, and reasonably justify a different rule.

. . .

If persons under the same circumstances and conditions are treated differently, there is arbitrary discrimination, and not classification.

(Emphasis added.) Plaintiffs contend that because the City conducted no studies or fact-finding into whether businesses employing more than twenty-five workers had "real differences" from smaller businesses, such a choice is invidious or arbitrary discrimination. We disagree for two reasons. First, this argument erroneously attempts to shift the burden onto the City to justify its policy choice. It is Plaintiffs' burden to demonstrate the flaws in the classification; no such justification is required for social and economic legislation as long as the classification is rationally related to a legitimate government purpose. *Wagner,* 2005–NMSC–016, ¶ 12, 137 N.M. 734, 114 P.3d 1050.

{50} Second, size-based exemptions for small businesses, either based on gross receipts or the number of employees, were proposed by the management members of the Roundtable. In its recommendations, the management minority of the Roundtable suggested that if the city council did expand the wage requirement to private employers, the ordinance should differentiate among businesses by limiting the ordinance to "employers with gross receipts of $5 million or more per year," stating that "[s]maller businesses simply have a limited capacity to leverage large expense increases." Prior to issuing its report, the minority also issued a list of "Vital Areas of Concern" to the Roundtable stating, in part, that "[e]mployers who employ fewer than 10 full-time employees should be exempted from the mandated minimum wage." We cannot see how an exemption based on business size, which was proposed by both advocates and opponents of the ordinance, is irrational beyond a reasonable doubt. The fact that the exemption was expanded from the initial ten employee cut-off to twenty-five does not make it irrational; the decision to temper the impact on Santa Fe businesses until more study on the ordinance's impact could be completed appears to us to be reasonable. From our prior summary of cases holding minimum wage legislation to be a valid exercise of the police power, it is also readily apparent that minimum wage legislation serves a legitimate government purpose.

{51} Plaintiffs next argue that the holding in *Burch,* where our Supreme Court struck down a state minimum wage statute, requires the same result here. *Burch* teaches that when the law creates a classification, "there must always be uniformity within the class." *Burch,* 62 N.M. at 224–25, 308 P.2d at 203 (striking down a wage classification as "arbitrary and oppressive and without any valid reason" when the class included food or drink servers as well all types of drug store employees, not just those drug store employees serving food or drink). Here, Plaintiffs have failed to show how, as in *Burch,* there is such a blatant and oppressive heterogeneity within a classification that there can be no valid reason for it. Even opponents of the ordinance recognized a reason for a size-based classification. The city council's ultimate selection of the twenty-five employee cutoff is rationally related to a legitimate government purpose and Plaintiffs have not shown how it is invidious, arbitrary, or irrational. We therefore conclude the ordinance does not offend equal protection guarantees provided by the New Mexico Constitution.

## B. EMINENT DOMAIN

{52} Plaintiffs argue that the ordinance constitutes a taking of private property in violation of the takings clause in the New Mexico Constitution based on testi-

mony at trial that each of Plaintiffs' ventures would be economically destroyed within a matter of a few years due to the ordinance. The New Mexico takings clause states that "[p]rivate property shall not be taken or damaged for public use without just compensation." N.M. Const. art. II, § 20. The only difference between our takings clause and the federal takings clause is the inclusion of the words "or damaged" in the New Mexico Constitution. Although our cases have pointed out that the "or damaged" provision allows compensation when an actual taking has not occurred, *see Sunland Park v. Santa Teresa Svcs. Co.*, 2003–NMCA–106, ¶ 44, 134 N.M. 243, 75 P.3d 843, our jurisprudence in this area does not materially vary from federal jurisprudence. *See Estate & Heirs of Sanchez v. County of Bernalillo*, 120 N.M. 395, 396–99, 902 P.2d 550, 551–54 (1995). Because the New Mexico takings clause parallels the federal clause, *E.Spire Communications, Inc. v. Baca*, 269 F.Supp.2d 1310, 1325 (D.N.M.2003), *aff'd by E.Spire Communications, Inc. v. N.M. Public Regulation Commission*, 392 F.3d 1204 (10th Cir.2004), we find federal case law instructive. There is federal authority rejecting Plaintiffs' argument outright. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 222–23, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (providing minimum wage laws as an example of regulations that do not constitute a taking); *see also McGrew v. Indus. Comm'n*, 96 Utah 203, 85 P.2d 608, 611 (Utah 1938) (holding that a minimum wage law is not a taking because an employer is neither required nor forbidden to employ anyone and no property right is being taken from the employer). In *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339 (Fed.Cir.2001) (in banc), the Court of Appeals for the Federal Circuit extracted from the plurality opinion in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), the conclusion that a majority of the United States Supreme Court has "rejected the theory that an obligation to pay money constitutes a taking." *Commonwealth Edison Co.*, 271 F.3d at 1339.

{53} New Mexico law compels the same conclusion. Our Supreme Court, in *Temple Baptist Church, Inc. v. City of Albu-*

*querque*, 98 N.M. 138, 144–45, 646 P.2d 565, 571–72 (1982), stated:

> The general rule is that a regulation which imposes a reasonable restriction on the use of private property will not constitute a "taking" of that property if the regulation is (1) reasonably related to a proper purpose and (2) does not unreasonably deprive the property owner of all, or substantially all, of the beneficial use of his property.

The wage regulation here does not appear to be a "restriction on the use of private property" because Plaintiffs can continue to use their businesses as they wish. In addition, the wage rate in contracts for labor is generally not considered a vested property right of the employer. *See E.Spire Commc'ns, Inc.*, 269 F.Supp.2d at 1325–26 (holding that a utility had no vested property right to a particular regulatory rate and even if it did, its contracts were clearly subject to additional regulation); *see also McGrew*, 85 P.2d at 610 (holding that an employer has no vested right in the labor of his workers). However, even if the ordinance did restrict the use of private property, it is reasonably related to a proper purpose and does not deprive the business owner of substantially all of the beneficial use of his property, given the absence of any severe, retroactive liability. *E. Enters.*, 524 U.S. at 500, 118 S.Ct. 2131 (stating that economic legislation "might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and if the extent of that liability is substantially disproportionate to the parties' experience").

{54} Plaintiffs have not directed us to any authority, and we have found none, in which a minimum wage law has been viewed as a violation of either the federal or a state takings clause. We decline to be the first, particularly where we cannot identify any limiting principle that would prevent such a holding from potentially converting the vast majority of public health, safety, and welfare regulations, which typically burden businesses with some additional costs, into takings of private property by the state.

## III. RATE-MAKING

{55} Plaintiffs also argue that by setting a minimum wage, the City was engaged in rate-making within the meaning of New Mexico law and therefore had to comply with rate-making requirements that ensure a reasonable rate of return to the impacted businesses. In making this argument, Plaintiffs direct us to traditional rate-making cases involving utilities. *See In re Petition of PNM Gas Servs.*, 2000–NMSC–012, ¶ 105, 129 N.M. 1, 1 P.3d 383 (vacating and annulling the public utility commission's order denying a gas utility's rate case); *In re Gen. Tel. Co. of S.W.*, 98 N.M. 749, 751, 652 P.2d 1200, 1202 (1982) (reviewing telephone rate making proceedings); *Mountain States Tel. & Tel. Co. v. N.M. State Corp. Comm'n*, 90 N.M. 325, 329, 563 P.2d 588, 592 (1977) (same). We are unpersuaded. These cases do not address municipal regulation of private businesses in any respect and do not support Plaintiffs' implicit argument that the definition of rate-making should be expanded to cover regulation of private wages by ordinance. *Ramirez v. Dawson Prod. Partners, Inc.*, 2000–NMCA–011, ¶ 10, 128 N.M. 601, 995 P.2d 1043 (stating that "cases are not authority for propositions they do not consider").

## IV. PROCEDURAL ERRORS

{56} Plaintiffs claim various procedural errors in either the enactment of the ordinance or the management of the trial. We discuss and reject each in turn.

## A. ABSENCE OF FISCAL IMPACT REPORT

{57} Plaintiffs claim that the City violated a city ordinance mandating the preparation of a fiscal impact report for all proposed ordinances and resolutions. Thus, because the City did not prepare a fiscal impact report before it expanded the living wage ordinance, Plaintiffs contend the ordinance is invalid.

{58} The applicable Fiscal Impact Report Ordinance, Santa Fe, N.M., Administration: Fiscal Impact Reports; Ordinances and Resolutions ch. II, § 2.10 (1997), provides:

A. For the purpose of regulating the immediate and apparent long-range fiscal implications of proposed ordinances and resolutions, the City of Santa Fe Rules and Instructions for Fiscal Impact Reports is adopted by reference and incorporated as fully as if set out herein.

B. Fiscal impact reports shall be completed for all proposed ordinances and resolutions to be considered for adoption of the governing body.

C. A copy of the City of Santa Fe Rules and Instructions for Fiscal Impact Reports shall be kept for distribution at the city of Santa Fe finance office.

D. Completed fiscal impact reports shall be filed in the office of the city clerk.

{59} To the extent we must interpret the fiscal impact report ordinance, we do so de novo. *Acosta v. City of Santa Fe*, 2000–NMCA–092, ¶ 16, 129 N.M. 632, 11 P.3d 596. We construe an ordinance as we would a statute, giving effect to the intent and purpose of those who enacted it, reading all parts together as a harmonious whole, and refraining from adding in language not present. *Id.* ¶ 17.

{60} The City completed a fiscal impact report prior to the original living wage ordinance, passed in 2002, which applied only to city workers, grantees, and major contractors. The City argues that a fiscal impact report was not required for the 2003 amendments to the ordinance, which expanded the requirements to certain private employers, because the Fiscal Impact Report Ordinance is intended to "assess the impact of proposed ordinances or resolutions on the City's expenditures and revenues, and are not designed to assess fiscal impacts on private business." At trial, the City presented testimony from city employees that the fiscal impact report requirement had traditionally been aimed at assessing impacts to city departments, budgets, and staffing. Thus, because the 2003 amendments involved no additional direct city expenditures, the City contends that a second fiscal impact report was not necessary.

{61} We agree. The fiscal impact report form and instructions, which are incorporat-

ed by reference into Fiscal Impact Reports; Ordinances and Resolutions ch. II, § 2.10, confirm that the fiscal impact report requirement is intended to provide city policymakers with information on the impact to city department budgets, staffing, and capital expenditures caused by proposed ordinances or resolutions. For example, Section C of the fiscal impact report form states that financial information on the fiscal impact report "does not directly translate into a budget increase" and goes on to explain the processes, "similar to annual requests for budget," by which a city department requests a budget increase from the finance committee. The form also contains lines for personnel expenses, capital outlay expenses, and operating costs, as well as spaces to identify which public funding source would pay for such expenses. The fiscal impact report form states that the city manager must approve any increases in staffing in advance, and requires that staffing increases be approved by the human resources department.

{62} It would be inappropriate and contrary to the fiscal impact report instructions to complete a fiscal impact report form for fiscal impacts to private businesses. While an ordinance or resolution impacting private entities may have indirect fiscal impact on city coffers by stimulating or depressing tax payments or the need for city services, assessing such incidental impacts to the City is clearly not the objective of the fiscal impact report requirement. Construing the ordinance as a whole, the plain meaning of the fiscal impact report requirement contained in Fiscal Impact Reports; Ordinances and Resolutions ch. II, § 2.10, is that it ensures city policymakers are provided with estimates of the impact of an ordinance or resolution on the City's own budget. Because the City completed a fiscal impact report for the initial living wage ordinance in 2002, which did directly impact city expenditures, there was no requirement to complete a fiscal impact report for the 2003 amendments to the ordinance which had no such direct impact.

**B. MISCELLANEOUS PROCEDURAL ERRORS BY THE DISTRICT COURT**

{63} Plaintiffs contend that the district court (1) abused its discretion in its manage-ment of discovery regarding the City's expert economist, Dr. Robert Pollin, and (2) erred in failing to adopt "uncontroverted and unimpeached testimony" in connection with Plaintiffs' takings claim.

**1. DISCOVERY MANAGEMENT**

{64} Plaintiffs argue that they were severely prejudiced by the short amount of time they had to review the raw information providing the basis for a report from Dr. Pollin. They contend that the City unjustifiably withheld this underlying information for one month, and that the appropriate sanction was to bar Dr. Pollin's testimony or continue the trial. As background, we recount selected events leading up to trial.

{65} The district court rescheduled the trial from February 2004 to April 12, 2004. On February 20, 2004, the court orally ordered that the City disclose any expert witnesses it intended to call by February 25, 2004, and provide any expert reports in existence. In its filed order, the district court directed that both parties "shall disclose all expert witnesses and their addresses and the general nature of their testimony." On February 25, 2004, the City wrote to Plaintiffs identifying Dr. Pollin as its expert witness and provided a list of the subjects upon which he was expected to testify and other background materials, such as his prior research. On March 4, 2004, Plaintiffs moved under Rule 1–037 NMRA, to exclude Dr. Pollin because the City had neither provided Dr. Pollin's report nor stated Dr. Pollin's opinion or the bases therefor, thereby depriving Plaintiffs of an "opportunity to prepare an effective cross-examination" or obtain a rebuttal expert. On March 9, 2004, the City provided Plaintiffs with Dr. Pollin's final report, which had been completed that same day. On March 15, 2004, the district court held a hearing on Plaintiffs' expedited motion to exclude the testimony of Dr. Pollin and denied the motion. On April 2, 2004, Plaintiffs made an emergency application for an order to either exclude his testimony or bifurcate the trial. The district court denied this motion. Six days before trial, the City

808

provided to Plaintiffs a compact disk and binders with selected printouts containing the data supporting Dr. Pollin's analysis.

{66} Ultimately, Plaintiffs did call their own rebuttal expert economist, Dr. Aaron Yelowitz, after Dr. Pollin had testified. Yelowitz testified that he was able to form an opinion about the conclusions and methods in Dr. Pollin's report, but he was not able to confirm Dr. Pollin's calculations due to the limited time he had prior to trial to review the materials. However, on cross, Yelowitz conceded that he had not seen the binder of selected documents that the City had identified as being the most important.

{67} Whether we frame the issue as a denial of a motion for continuance or as a denial of sanctions on discovery, we apply an abuse of discretion standard. *State v. Torres*, 1999–NMSC–010, ¶ 10, 127 N.M. 20, 976 P.2d 20 (stating abuse of discretion is the standard for denial of continuance); *Enriquez v. Cochran*, 1998–NMCA–157, ¶ 20, 126 N.M. 196, 967 P.2d 1136 (stating that abuse of discretion applies for a court's choice of sanctions). "An abuse of discretion will be found when the trial court's decision is clearly untenable or contrary to logic and reason." *Newsome v. Farer*, 103 N.M. 415, 420, 708 P.2d 327, 332 (1985). "When there exist reasons both supporting and detracting from a trial court decision, there is no abuse of discretion." *Talley v. Talley*, 115 N.M. 89, 92, 847 P.2d 323, 326 (Ct.App.1993).

{68} Our review of the February 25, 2004 letter from the City to Plaintiffs indicates compliance with the district court's written order to identify the expert and describe generally the nature of his expected testimony. Dr. Pollin's report, which reportedly was completed on March 9, 2004, was provided to Plaintiffs on the same day. The combination of the letter and the report certainly met the requirements of Rule 1–026, which requires only a "summary of the grounds for each opinion." We note that Dr. Pollin's report has a methodology section and appendices and identifies the public data sets used for the analysis. This is clearly enough to suffice as a "summary" of the grounds for his opinion and was in the hands of Plaintiffs

over one month prior to trial for review by their experts.

{69} We do not see the court's ruling as clearly untenable or beyond logic or reason. We see reasons supporting the district court's decision to proceed with trial, such as the need to avoid a second continuance and the notion that under Rule 1–026 all of the data underlying Dr. Pollin's report need not have been provided to Plaintiffs. One reason detracting from the district court's ruling could be a desire to ensure that Plaintiffs' experts had ample time to review all of the data and methods underlying Dr. Pollin's report prior to trial, even if it was not strictly required. The district court would have been well within its discretion to either grant or deny a continuance or bifurcation. *See Talley*, 115 N.M. at 92, 847 P.2d at 326. We doubt whether sanctions, up to and including exclusion of Dr. Pollin's testimony, would have been appropriate, and so it was proper for the district court to deny the extreme sanction of exclusion.

**2. REJECTION OF PURPORTEDLY UNCONTROVERTED TESTIMONY**

{70} Plaintiffs next argue that in considering their takings claim, the district court improperly rejected "uncontroverted and unimpeached" testimony as to the costs of the ordinance and its impact on Plaintiffs' profitability. Plaintiffs' claim has no merit. Whether the district court did or did not believe Plaintiffs' assertions as to their expectations or costs is irrelevant because it decided as a matter of law that the ordinance did not constitute a taking. As we discussed above, this ruling was correct and we can affirm on that basis.

{71} Moreover, we find no merit to Plaintiffs' contention. This was a case that had contradictory testimony from the City's witnesses as well as self-contradictory testimony from Plaintiffs' own witnesses. It is well established that "[w]here there is conflicting evidence, the trial court, as fact finder, resolves all disparities in the testimony and determines the weight and credibility to be accorded to the witnesses." *See Tres Ladrones, Inc. v. Fitch*, 1999–NMCA–076, ¶ 16, 127 N.M. 437, 982 P.2d 488.

**CONCLUSION**

{72} The City has the power to set a minimum wage for private employers that is higher than that mandated by the state. The ordinance does not conflict with state law and is not otherwise unconstitutional. The decision of the district court is therefore affirmed.

{73} **IT IS SO ORDERED.**

BUSTAMANTE, C.J. and PICKARD, J., concur.