# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>October 14, 2016</u>

**NOS. 32,936, 32,945 & 32,953 (Consolidated)**

**GARY AND KIMBERLY COBB,**

      Plaintiffs-Appellees,

and

**CLARENCE G. SIMMONS and
SUSAN BEGY SIMMONS,**

      Third-Party Defendants-Appellees,

v.

**JOSEPH GAMMON and LINDA
GAMMON,**

      Defendants-Appellants,

and

**FFFP, LLC**

      Third-Party Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY
George P. Eichwald, District Judge**

Wray & Girard, PC
Katherine Wray
Albuquerque, NM

Sanders & Westbrook, PC
Maureen A. Sanders
Albuquerque, NM

for Appellees Simmons

The Hemphill Firm, P.C.
Linda G. Hemphill
Santa Fe, NM

Paul W. Grace LLC
Paul W. Grace
Santa Fe, NM

for Appellants Gammon

Dixon, Scholl & Bailey, P.A.
Gerald G. Dixon
Lisa Joynes Carrillo
Albuquerque, NM

for Appellants FFFP, LLC and French & French Fine Properties, Inc.

# OPINION

**KENNEDY, Judge.**

{1}     Joseph and Linda Gammon, builders in search of a property to split and develop, purchased a piece of property with the help of their realtor, French & French Fine Properties, Inc. (FFFP). Neither the Gammons nor FFFP took notice of a covenant creating a minimum lot size for that property, and the Gammons created two impermissibly small lots from the property they purchased. The neighboring property owners sued the Gammons and FFFP seeking to enforce the covenant. Meanwhile, Clarence and Susan Simmons (Simmons) purchased land adjacent to the Gammons' property. FFFP filed a third-party action against the neighboring property owners, including the Simmons, seeking to bind them to the outcome of the case involving the enforceability of the covenant. The Simmons, unaware of the Gammons covenant violation during their purchase of the property and relying on FFFP's representations as to the existence of an enforceable covenant, then filed suit against FFFP for negligent misrepresentation. The district court ruled against the Gammons in the first case dealing with enforceability, and against FFFP with regard to the negligent misrepresentation claims.

{2}     Only the issues presented in the Simmons' case against FFFP remain on appeal. FFFP asserts that the Simmons did not prove that FFFP made misrepresentations during the sale to the Simmons and that the Simmons also did not prove the justifiable

reliance necessary for their negligent misrepresentation claim. FFFP appeals the district court's award of compensatory damages to the Simmons in the form of disgorgement of commission, attorney's fees, pecuniary loss, and transaction costs. We affirm the award of compensatory damages for the pecuniary loss. We remand the award of disgorgement of commission and transaction costs so that the district court may recalculate those damages as set forth in this opinion. We also remand the award of attorney's fees so that the district court may determine which fees were incurred while defending against FFFP's suit, and which were incurred while affirmatively pursuing the negligent misrepresentation claims. The Simmons are entitled only to those attorney's fees incurred in defending against the suit.

**I.      FACTUAL BACKGROUND**

{3}      In 1980, HMBL Venture (HMBL) owned 116 acres of property (HMBL Property) and split the property into four tracts (Tracts 1, 2, 3, and 4), imposing an identical restrictive covenant upon each tract when it was sold. The restrictive covenant attached to each of the four tracts that made up the HMBL Property, and the lots resulting from subdivision of those tracts included seven provisions, two of which are relevant to this appeal. The first reads, "[t]his land shall not be divided into parcels of less than five acres." The second provides, "[t]he covenants and restrictions shall run with and bind the land until the year 2020. They may be enforced by any person who has title to any of the property which is subject to these same restrictive

2

covenants." Each of the four tracts within the HMBL Property were subsequently divided and sold.

**A.	The Gammons' Purchase of Lot 4A2**

{4}	In 2002, the Gammons purchased five acres within Tract 4 of the HMBL Property (Lot 4A2). The Gammons were represented by a broker from FFFP.[1] The warranty deed conveying Lot 4A2 stipulated that the tract was "SUBJECT TO: Restrictions, reservations and easements of record." The restrictive covenant for Lot 4A2 was recorded in Book 530, page 343, of the records of the Santa Fe County Clerk. Prior to closing on Lot 4A2, the Gammons received information from their title insurance company that disclosed the existence of the restrictive covenant as well as where it was recorded. Neither the Gammons nor their FFFP broker reviewed the text of the covenant, despite receiving documents containing this information from the title insurance company.

{5}	After purchasing Lot 4A2, the Gammons divided their five-acre parcel into two two-and-one-half acre lots and constructed a house on one of the lots. The Gammons sold that house and lot to Lawrence Goldstein in October 2003.[2] While constructing

---

[1]We acknowledge that French & French has changed hands several times, resulting in several name changes. For the sake of clarity, however, we refer to all present and past versions of French & French Fine Properties, Inc., French & French Sotheby's, FFFP LLC, and any other variations of the name, as FFFP.

[2]Goldstein is not a party to this appeal.

a house on the second two-and-one-half acre lot, the Gammons discovered they were in violation of the covenant burdening Lot 4A2. FFFP assured the Gammons it would fix the problem with the restrictive covenant.

{6} FFFP discussed potential remedies to the violation with both the Gammons and Goldstein. These remedies included "condominiumizing" both of the violating lots within Lot 4A2, acquiring acreage from surrounding lots to bring each lot into compliance with the minimum size requirement, and obtaining a waiver of or amendment to the existing covenant from all HMBL Property owners. Ultimately, FFFP pursued plans to get all landowners within the HMBL Property to waive objections to or consent to amending the restrictive covenant that burdened the tracts within the HMBL Property.

{7} In August 2005, FFFP hand-delivered letters to all HMBL Property owners requesting signatures to "resolve an expiring deed restriction." The letter was accompanied by a copy of the relevant deed and restrictive covenant, a diagram specifying which tracts had acquiesced to the waiver and amendment as well as which tracts within the HMBL Property were in violation of the covenant, and copies of the proposed waiver and amendment. Because of FFFP's circulating the letter, Gary and Kimberly Cobb (the Cobbs) learned of the Gammons' covenant violation, as well as three other restrictive covenant violations within the HMBL Property. The Cobbs

4

refused to sign the waiver and amendment. FFFP's attempts to get the waiver and amendment signed by other neighboring property owners were also unsuccessful.

**B.    Simmons and the Trust Property**

{8}    Lots 2A, 3B, 3C, 3D, 4B, 4C, and 4D within the HMBL Property belonged to a trust (Trust Property) that Cowden Henry and Thomas Craddock managed as trustees.[3] Ray Rush and Tim Van Camp, brokers for FFFP, listed the Trust Property for sale. The Simmons were searching for property in the Santa Fe area that was protected from dense development, had unobstructed views, was in a quiet setting, and had low potential for adjacent development. The Simmons were working with Neil Lyon, another FFFP broker, during their search. Lyon and Van Camp showed the trust property to the Simmons, and during the Simmons' many subsequent visits to the property, the FFFP brokers told them that some of the neighbors were interested in amending the existing covenants. On May 2, 2005, unbeknownst to the Simmons who were contemplating purchasing the Trust Property, Van Camp obtained Henry's and Craddock's signatures, as trustees for the Trust Property, on the waiver and amendment to the covenant that FFFP was circulating among the HMBL Property owners. The Simmons signed a purchase agreement on May 13, 2005, and closed on the property on June 15, 2005. Both houses on the Gammons' Lot 4A2, which was

---

[3]Lot 4C abuts the Gammon/Goldstein property, while lots 4B and 4D each share one corner with the Gammons' property.

adjacent to Tract 4C of the purchased Trust Property, existed when Simmons purchased the Trust Property. In late 2008 and early 2009, FFFP approached the Simmons, requesting that they either turn over a portion of the trust property to cure Lot 4A2's violation, or sign the waiver and amendment. The Simmons refused to consent to either proposed solution. The Simmons were neither offered the reasonable value of the property in exchange for the acreage, nor provided with a copy of the waiver or amendment that the sellers had signed.

## II. PROCEDURAL HISTORY

{9}     After finding out about the Gammons' covenant violation through FFFP's attempts to obtain signed a waiver and amendments, the Cobbs joined with other HMBL lot owners (collectively, the Cobb Plaintiffs) and filed suit in January 2006 against the Gammons and Goldstein.[4] In the complaint, the Cobb Plaintiffs sought enforcement of the covenant through declaratory judgment and an injunction, and they requested punitive damages. The Cobb Plaintiffs later amended their complaint, adding a claim against FFFP and the Gammons for conspiracy to breach the covenant, a claim against FFFP for aiding and abetting, and requesting punitive damages against FFFP.

---

[4]Plaintiffs in the case included Gary and Kimberly Cobb, who owned Tracts 1-4, Carl Gilbert and Sandra Bonchin, who owned Tracts 1-1A, Perry and Barbara Jeffe, who owned Lots 1-2 and Jafet Gonzalez and Deborah Wirth, who owned Lot 1-1B.

{10}    In 2009, the Gammons, Goldstein, and FFFP filed a third-party complaint against all others who owned lots within the HMBL Property, including the Simmons, seeking judgment binding the property owners to any judgment rendered in FFFP's case against the Cobb Plaintiffs. The Simmons filed a counterclaim against the Gammons, Goldstein, and FFFP. In that counterclaim, the Simmons sought a declaratory judgment regarding the covenant violation and an injunction requiring compliance with the restrictive covenants; they also brought claims of negligent misrepresentation and constructive fraud against FFFP.

{11}    The Cobb Plaintiffs' claims, the Gammons and FFFP's third-party complaint, and the Simmons' counterclaim were all tried together in a district court trial that lasted eleven days. After trial, the district court issued extensive findings of fact and conclusions of law. The district court's final judgment, entered on April 16, 2013, awarded the Cobb Plaintiffs unjust enrichment damages and punitive damages against the Gammons and FFFP.[5] It also awarded the Simmons compensatory damages against FFFP.[6] The Gammons and FFFP appealed the district court's judgment, and the appeals were consolidated. After briefing, the parties settled the Cobb Plaintiffs' claims against FFFP.

[5]The district court also awarded pre-judgment interest on the unjust enrichment damages, taxable costs, and post-judgment interest.

[6]The district court also awarded taxable costs and post-judgment interest.

## III. DISCUSSION

{12}    The Cobb Plaintiffs prevailed against both the Gammons and FFFP. As a result of the settlement, the Cobb Plaintiffs' judgment and claims against FFFP are dismissed from this appeal. While this appeal was pending, the parties alerted this Court to the fact that the Gammons have undergone bankruptcy proceedings, and the bankruptcy court discharged the Gammons' debts, including the district court's judgment for the Cobb Plaintiffs.

{13}    The Gammons concede that, with respect to the issues of damages, their appeal from the district court judgment is moot. An issue is moot when no actual controversy exists, and the court cannot grant actual relief. *Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008. We agree with the Gammons that the issues of damages are moot in light of their bankruptcy discharge, and we do not address them. However, FFFP's appeal of the judgment in favor of the Simmons remains. We begin with a discussion of the covenant from which this litigation originates.[7]

## A.    The Enforceability of the Restrictive Covenant

---

[7]Though primarily briefed by the Cobb Plaintiffs and the Gammons, FFFP, and the Simmons both briefed the issue of whether the covenants are enforceable. Furthermore, both parties objected to the dismissal of the Cobb Plaintiffs' appeal on the basis that the covenant issue needed to be addressed. It is relevant to our consideration of the Simmons' appeal, and we address it.

8

{14} The HMBL Property was sold in four different tracts and at four different times. While Tracts 2, 3, and 4 were conveyed subject to a restrictive covenant in 1980, Tract 1 was not conveyed until 1982. The Tracts were later subdivided into lots. The Gammons' property was located in Tract 4.

{15} Though the FFFP's arguments regarding the covenant's enforceability are poorly developed and circular, they can be summarized into two broad statements: the covenant in this case does not run with the land, and the Cobb Plaintiffs, the Simmons, and other HMBL Property owners cannot enforce the covenant due to the lack of a general plan or scheme within the HMBL Property. The Gammons first suggested that the covenant in question was personal, rather than one that runs with the land. Citing *Suttle v. Bailey*, 1961-NMSC-044, ¶ 13, 68 N.M. 283, 361 P.2d 325 (holding that grantor's reservation of general power to dispense with restrictive covenants destroyed mutuality or reciprocity so necessary to create a covenant that runs with the land), in support of this theory, the Gammons reasoned that there was never an enforceable restrictive covenant governing the HMBL Property because there was no "mutuality and no reciprocity" between the restrictions imposed upon Tract 4 and Tract 1. We address each of the Gammons' arguments in turn. A determination of whether the restrictive covenant could be enforced against the Gammons required the district court to interpret the covenant; we review such a legal determination de novo. *See Heltman v. Catanach*, 2010-NMCA-016, ¶ 5, 148 N.M.

9

67, 229 P.3d 1239; *see also Smart v. Carpenter*, 2006-NMCA-056, ¶ 7, 139 N.M. 524, 134 P.3d 811 (stating the rule that appellate courts review the district court's conclusions of law de novo).

**1.      Requirements for Covenant Running With the Land**

{16}      In order to establish an enforceable covenant running with the land, the covenant must touch and concern the land, the original covenanting parties must intend the covenant to run with the land, and the successor to the burden must have notice of the covenant. *Lex Pro Corp. v. Snyder Enters., Inc.*, 1983-NMSC-073, ¶ 7, 100 N.M. 389, 671 P.2d 637. The Gammons concede they had constructive notice, which satisfies the notice requirement for restrictive covenants. *See id.*; NMSA 1978, § 14-9-2 (1886-87).

{17}      In determining whether a covenant touches and concerns the land, we conduct "an objective analysis of the contents of the covenant itself." *Cypress Gardens, Ltd. v. Platt*, 1998-NMCA-007, ¶ 8, 124 N.M. 472, 952 P.2d 467. A covenant touches and concerns the land if its performance renders the burdened land less valuable while rendering the benefitted land more valuable. *See Lex Pro Corp.*, 1983-NMSC-073, ¶ 8. In more archaic terms, restrictions on the use of land are "mutual, reciprocal, equitable easements in the nature of servitudes in favor of owners of other lots within the restricted area, and constitute property rights which run with the land." *Montoya*

*v. Barreras*, 1970-NMSC-111, ¶ 12, 81 N.M. 749, 473 P.2d 363. The express terms of the restrictive covenant in this case place a burden on the Gammons' property prohibiting the creation of lots smaller than five acres while benefitting the other HMBL Property owners' interest in their property by allowing them to enjoy a lower density of development, less traffic, and unobstructed views.[8]

{18}    Where the deed does not specify that the covenant is to run with the land, we must turn to an evaluation of the parties' intent regarding the covenant. *Dunning*, 2011-NMCA-010, ¶ 18 (requiring a consideration of the circumstances surrounding the transaction and the objective of the parties making the restriction in analysis of the parties' intent). That is not necessary here, as the express language of the covenant provides that "the covenants and restrictions *shall run with and bind the land* until the year 2020." When covenant provisions are unambiguous, the district court must "enforce the expressed intentions as set forth in covenants." *Aragon v. Brown*, 2003-NMCA-126, ¶ 11, 134 N.M. 459, 78 P.3d 913. The Gammons' recorded deed specifically enumerates that Lot 4A2 is subject to recorded restrictions, and the restrictive covenant in this case is recorded. The covenant in this case therefore "touches and concerns" the land, as established by its clear language, and the

---

[8]There remains "no practical distinction in our case law between equitable servitudes and restrictive covenants that would necessitate the continued use of separate terms[.]" *Dunning v. Buending*, 2011-NMCA-010, ¶ 10, 149 N.M. 260, 247 P.3d 1145.

11

Gammons had notice of the covenant's existence. We hold that the restrictive covenant in this case runs with the land.

{19} The Gammons' reliance on *Suttle* for their argument that this is a personal covenant, is unpersuasive. In *Suttle*, our Supreme Court looked at the issue of whether "a reservation by the grantor of a general power to dispense with restrictions [is] a personal covenant, or one which runs with the land[.]" 1961-NMSC-044, ¶ 4. Applying the general rule that covenants burdening land sold under a general plan of restriction could be enforced by one landowner against another within a subdivision, *id.* ¶ 5, the Court concluded that a grantor's reservation of the right to alter or annul the covenant destroyed the mutuality and reciprocity necessary to create a covenant running with the land, because no subsequent grantee had any assurance that the restrictions might not be altered without his consent. *Id.* ¶ 13. Because the grantor's reserved right to alter the covenant made the covenant personal, there existed "no right as between the individual grantees to enforce the restrictive covenants[.]" *Id.* Here, HMBL made no reservation of right to amend or annul the covenant; *Suttle* is inapposite. We next address the Gammons' assertion that no right to enforce the covenant exists because the HMBL Property lacks a general plan or scheme.[9]

---

[9]To the extent that this argument is aimed toward characterizing the covenant at issue as a personal one that does not bind the covenantor's successors in interest, *Lex Pro Corp.*, 1983-NMSC-073, ¶ 12, it fails in light of the above analysis characterizing the covenant as one running with the land.

## 2. General Plan or Scheme

{20}    The Gammons contend that they had no notice "that covenants affecting [Lot 4A2] potentially could be enforced by the owners of other lots within Tract 4" and that the lack of a general plan or scheme within the HMBL Property kept them from receiving notice of the restrictive covenant on Lot 4A2.[10] More specifically, they suggest that because the HMBL Property was sold piecemeal and at different times, there was no general plan in existence and the covenant does not touch and concern the entire HMBL Property. This view is incorrect.

{21}    "[W]here an owner of a tract subdivides and sells under a general plan of restrictions, the restrictions may be enforced by one grantee against another." *Sharts v. Walters*, 1988-NMCA-054, ¶ 8, 107 N.M. 414, 759 P.2d 201. The "absence of an observable general plan does not negate the express language" of the restrictive covenant. *Dunning*, 2011-NMCA-010, ¶ 16. When a covenant meets the requirements for an enforceable covenant running with the land, proof of a general plan or scheme is unnecessary. *Id.* ¶ 14. The existence of a general plan or scheme is mostly used to prove three things: that covenanting parties intended a covenant to run with the land, that a purchaser had notice of the covenant, or that restrictions apply to parcels even

---

[10]Although this is the argument made, the reference to Tract 4 seems to be a typographical error. It appears the Gammons meant Tract 1, as that is the tract in which the Cobb Plaintiffs' lots are located.

13

where they have been omitted from the written deed. *Id.* ¶ 13. In this case, those things are established, and the purposes of proving a general plan or scheme are already fulfilled. Proof of a general plan or scheme is therefore unnecessary.

{22}     Even if the general plan doctrine were applicable here, the Gammons' argument would fail because a general plan can be inferred from the circumstances of this case. The existence of a general plan "may be inferred from the inclusion of similar restrictions in the deeds from a common grantor[.]" Restatement (Third) of Prop.: Servitudes § 2.14 cmt. f (2000). The restrictive covenants affecting each HMBL Property tract are not merely similar or substantially similar; all four contain identical language. The district court concluded that inclusion of identical language in all of the deeds in an area demonstrates a grantor's intention to benefit all of the lots in the area. *See Rowe v. May*, 1940-NMSC-019, ¶ 32, 44 N.M. 264, 101 P.2d 391 (acknowledging that the identical language of the covenant in all deeds in the relevant area "could bear no other reasonable inference than that such deeds from the original grantor . . . gave sufficiently adequate and clear expression to its intention that the restriction was for the benefit of all the lots" (emphasis omitted)); *Lockwood v. Steiner*, 1984-NMSC-100, ¶ 9, 101 N.M. 783, 689 P.2d 932 (affirming narrow construction of restrictive covenant based on evidence that conveyances to all initial lot owners contained identical restrictive covenants that ran with the land). Though the HMBL Property may not have carried specific indicia typical to a general plan

14

such as representations in sales brochures, advertisements, and oral statements, *see Sharts*, 1988-NMCA-054, ¶ 10, we conclude that a general plan exists within the HMBL property.

**3.      Covenant's Reference to "This Land"**

{23}      The district court found that HMBL intended that any person whose property was subject to the restrictive covenants on the HMBL Property could enforce them. The district court also found that because the same restrictive covenant was imposed on all conveyances of property within the HMBL Property, all owners of all lots within HMBL Property could enforce the covenant against the Gammons. The Gammons and FFFP suggest that the language of the restrictive covenant applies only to Lot 4A2, such that other property owners within the HMBL Property cannot seek enforcement of the covenant. The restrictive covenant provides, "[*t*]*his* land shall not be divided"; the Gammons and FFFP assert "this" refers only to the tract concerned, and because the covenants were attached to the tracts at different times and in different conveyances, the covenant on Lot 4A2 cannot be enforced by anyone in another tract within the HMBL Property.

{24}      We construe the covenant as a whole rather than separate specific words and phrases from the rest of the provisions. *See* 20 Am. Jur. 2d *Covenants, Conditions and Restrictions* § 15 (2016) (stating the rule that covenants are to be construed as a whole and indicating that "[t]he intention of the parties is to be gathered from the

15

entire context of the agreement, and not from a single clause" (footnote omitted)); 21 C.J.S. *Covenants* § 5 (2016) ("In interpreting any single provision in a covenant, the entire agreement must be viewed as a whole."). Restrictive covenants are used "to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability." *Cunningham v. Gross*, 1985-NMSC-050, ¶ 8, 102 N.M. 723, 699 P.2d 1075 (internal quotation marks and citation omitted).

{25}    The Gammons' and FFFP's argument is flawed because it interprets the phrase "this land" in geographical isolation from the rest of the covenant language when the covenant permits enforcement "by any person who has title to any of the property which is subject to these same restrictive covenants." When considered as a whole, the provisions of the covenant reveal that the phrase "this land" is neither ambiguous, *see Cain v. Powers*, 1983-NMSC-055, ¶ 9, 100 N.M. 184, 668 P.2d 300 (stating that first step in construing covenant language is to determine whether ambiguity exists), nor does it support the interpretation suggested. While the phrase "this land" alone may refer to any portion of Tract 4, interpreting it to mean that only people who own a portion of Tract 4 may enforce the covenant is contrary to its express terms. Other provisions in the covenant reveal that any person who owns a portion of the HMBL Property and whose title is subject to a restrictive covenant identical to the one they seek to enforce may do so. This interpretation is particularly persuasive in light of the

16

general plan, discussed above, that can be inferred from the identical restrictive language in each of the four tract conveyances.

{26} To allow the Gammons' and FFFP's interpretation of this language to prevail would promote an illogical result, *id.* (noting that restrictive covenants must be considered so that an " 'illogical, unnatural or strained construction' will not be effected"), as it would render the covenant unenforceable against any tract owned entirely by one owner. For example, if Tract 3 were owned entirely by one owner, the owner of Tract 3 could divide it into impermissibly small lots without repercussions from the owners in Tracts 1, 2, or 4, who would be unable to enforce the covenant, because their land was restricted through separate conveyances. We therefore conclude that the restrictions were clearly created to preserve the entire HMBL Property's "genuine residential character, the symmetry and beauty of the area, and for the general good of all interested, [make it] an attractive and valuable residential district." *Rowe*, 1940-NMSC-019, ¶ 32. The Gammons' and FFFP's attempts to weaken the covenant's ability to do so by limiting the ability of others to enforce it fails as well. We hold that the restrictive covenant at issue in this case is valid and can be enforced by any owner of land within the HMBL Property. With the resolution of this issue as a backdrop, we turn specifically to FFFP's appeal of the judgment in favor of the Simmons.

**B.      Issues on Which Simmons Prevailed**

**1.      Negligent Misrepresentation**

{27}   We review the district court's findings regarding FFFP's negligent misrepresentation for substantial evidence. *See Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 1991-NMSC-097, ¶¶ 12-13, 113 N.M. 9, 820 P.2d 1323 (affirming the court's findings of negligent misrepresentation that were supported by substantial evidence). To prove negligent misrepresentation, the Simmons were required to prove that (1) FFFP made a material misrepresentation of fact to the Simmons, (2) the Simmons relied upon that representation, (3) FFFP knew the representation was false or made it recklessly, and (4) FFFP intended to induce the Simmons to rely on that representation. *See Saylor v. Valles*, 2003-NMCA-037, ¶ 17, 133 N.M. 432, 63 P.3d 1152. These elements must be established by a preponderance of the evidence. *Golden Cone Concepts, Inc.*, 1991-NMSC-097, ¶ 13. Negligent misrepresentation requires a failure to exercise ordinary care in obtaining or communicating a statement, or "an intent that the plaintiff receive and be influenced by the statement where it is reasonably foreseeable that the plaintiff would be harmed if the information conveyed was incorrect or misleading." *Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 1998-NMCA-017, ¶ 55, 124 N.M. 549, 953 P.2d 722.

18

{28} FFFP suggests that the Simmons could not have met their burden in proving negligent misrepresentation without proving FFFP's brokers failed to exercise reasonable care or competence through expert testimony as to the appropriate standard of care. FFFP also suggests that there is insufficient evidence of justifiable reliance and causation of damages to support negligent misrepresentation or an accompanying damages award. We disagree.

**a.       Expert Testimony Regarding Standard of Care**

{29} Negligent misrepresentation can be established by commission or omission. *See, e.g.*, *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank*, 1988-NMCA-111, ¶¶ 9, 12, 108 N.M. 84, 766 P.2d 928 (stating the rule that "a person may be held liable for damages caused by a failure to disclose material facts to the same extent that a person may be liable for damages caused by . . . negligent misrepresentation" so long as there exists a duty to disclose). While a broker may be held liable for negligent misrepresentation if he or she fails to exercise reasonable care or competence in obtaining or communicating information, the precise level of care and competence required will vary. *See Gouveia v. Citicorp Person-to-Person Fin. Ctr., Inc.*, 1984-NMCA-079, ¶ 10, 101 N.M. 572, 686 P.2d 262. FFFP asserts that in order to show that it failed to exercise reasonable care and competence in obtaining and communicating information to the Simmons, the Simmons were required to proffer expert testimony

19

regarding whether FFFP's conduct meets the requisite standard of care. Because no expert testimony was proffered, FFFP asserts that the Simmons failed to establish the elements of negligent misrepresentation. We disagree as to both assertions.

{30} FFFP cites to *Amato v. Rathbun Realty, Inc.*, 1982-NMCA-095, ¶ 11, 98 N.M. 231, 647 P.2d 433, as support for its assertion that expert testimony is required to establish whether a broker failed to properly advise a client regarding the condition of property. *Amato* dealt with the negligence of a broker in the summary judgment context. The movants in that case presented a single affidavit that stated the sources of information that the broker relied upon and disclaimed any knowledge of the complained-of defects in the property being sold. *Id.* ¶ 10. The court concluded that the showing made was insufficient to make a prima facie showing that no issue of fact existed as to whether the broker in that case was negligent. *Id.* ¶ 11 (stating that without an expert's testimony that broker "did not breach the standard of care of brokers in the community, no prima facie showing was made"). In this case, the Simmons only needed to prove at trial by a preponderance of evidence that FFFP did not exercise reasonable care or competence in communicating the disclosures relevant to the property to the Simmons.

{31} Liz Cale was a qualifying broker with FFFP when the Simmons purchased the Trust Property. She had supervised approximately 160 brokers within FFFP, had been

20

a licensed qualifying broker since 1989, and had acted in both an associate broker and qualifying broker capacity within FFFP.

{32} Cale testified as to what FFFP's brokers should have disclosed to the Simmons as well as the ways in which those disclosures could have occurred. Cale testified that the existence and circulation of the waiver and amendment should have been disclosed to the Simmons. Similarly, she testified that the fact that the sellers of the property had signed the waiver and amendment prior to the Simmons' purchase should have been disclosed to the Simmons. She also acknowledged that the FFFP brokers were aware of the Gammons' covenant violation, and could have disclosed to the Simmons that an adjoining property was in violation of the covenant. Cale stated that disclosure of this information could have been made in the purchase agreement or any of the subsequent negotiations, through a modified disclosure document, through a separate disclosure from the seller to the buyer, or verbally. Despite these opportunities for disclosure, nothing in the seller's disclosure statement mentioned the waiver, amendment, or known covenant violation present on the adjacent property. In fact, Cale acknowledged that no documentation from the sale could demonstrate that the Simmons or any similarly situated buyer was notified that the waiver and amendment existed or had been signed by the seller. This evidence demonstrated both a standard of care for the realtors, and the facts of non-disclosure.

21

{33} Section 16.61.19 NMAC sets out the duties of brokers and defines the disclosures that brokers are required to make when working with consumers, requiring the "disclosure of any adverse material facts actually known by the [broker] about the property or the transaction[.]" 16.61.19.8(H) NMAC (1/1/2004). FFFP uses this same language in its purchase agreement to define the duties of its brokers. This is mirrored in FFFP's statement in its own purchase agreement that it assumes the duty of "disclosure of any adverse material fact actually known," and the evidence also supports a conclusion that FFFP breached the duty it imposed on itself in the purchase agreement.

{34} It is undisputed that Neil Lyon was working for FFFP during the Simmons' purchase of the Trust Property. In fact, throughout his career at FFFP, he worked in several different capacities, including vice president, managing broker, and selling and listing agent. When questioned regarding the nature of his relationship with the Simmons during the purchase of the Trust Property, Lyon obtusely responded by stating "I think it's clearly defined by the basic licensee duties." The district court could reasonably infer that the "basic licensee duties" that Lyon references are those contained in the purchase agreement, which also match the standards set out in 16.61.19.8 NMAC.

{35} It is also beyond dispute that the FFFP brokers involved in the Simmons' purchase—Van Camp, Rush, and Lyon—knew of the covenant, the covenant violation, and FFFP's ongoing efforts to remedy the violation through the waiver and amendment. It is undisputed that Van Camp and Rush represented the sellers of the Trust Property, and as such, Van Camp knew that the sellers had signed the waiver and amendment at their behest prior to the Simmons submitting their first purchase agreement. Van Camp and Lyon both testified that the Simmons were aware of the covenant, the violation, and the efforts to enact a waiver and amendment to the covenant. The Simmons, however, testified that they were unaware of the existence of a covenant violation or waiver and amendment. This discrepancy is a matter for the fact-finder to resolve, and not a legal impediment to establishing the elements of a cause of action such as negligent misrepresentation. *See, e.g.*, *New Mexicans for Free Enter. v. City of Santa Fe*, 2006-NMCA-007, ¶ 71, 138 N.M. 785, 126 P.3d 1149 (stating that " 'where there is conflicting evidence, the [district] court, as fact[-]finder, resolves all disparities in the testimony and determines the weight and credibility to be accorded to the witnesses' " (alteration omitted) (quoting *Tres Ladrones, Inc. v. Fitch*, 1999-NMCA-076, ¶ 16, 127 N.M. 437, 982 P.2d 488)).

{36} According to his testimony, Mr. Simmons was unaware at any time prior to closing on the property, that the waiver and amendment existed and that the sellers had signed them. Mr. Simmons testified that had he and his wife known of the

23

covenant violation and the waiver and amendment before purchasing the house, they would not have purchased the house. In fact, and known to Lyon, prior to viewing the property in question, the Simmons had abandoned interest in another home upon discovering it was embroiled in pending litigation and was affected by dust from a neighbor's construction.

{37}    FFFP's brokers insisted that they achieved the result of making the relevant disclosures to the Simmons, but could proffer few or no details regarding the manner or method in which those disclosures were made. According to Van Camp's testimony regarding disclosure of the covenant violation, waiver, and amendment, he indicated to the Simmons that there was a possibility the waiver and amendment could be signed by HMBL Property owners in the future, rather than disclosing that the sellers had already signed the waiver and amendment. Although Van Camp testified that he told the Simmons that the waiver and amendment was signed, he could not recall when, where, or how many times he revealed that information. Van Camp also testified that he gave the Simmons a copy of the waiver and amendment, but the copy he provided was not the one previously signed by the sellers. Lyon's testimony was similar, as he had no recollection of where he had seen the waiver and amendment, whether a copy had been given to the Simmons, or whether the copy he saw bore the sellers' signatures. From these vague facts, a fact-finder could conclude disclosure was not made at all.

{38} The district court determined that the FFFP brokers neither informed the Simmons that the sellers had executed the waiver and amendment, nor provided the Simmons with a copy of the waiver and amendment. It also found that, based on Cale's testimony, the FFFP brokers should have disclosed that information to the Simmons. The district court found that the sole disclosure made—that some neighbors were interested in altering the covenants at some point in the future—was a factual misrepresentation in light of FFFP's possession of a waiver and amendment signed by sellers. The district court concluded that Van Camp and Lyon's testimony—that they told the Simmons that the waiver and amendment had been signed and gave the Simmons copies of those documents—was not credible. This determination was based on the lack of evidence of such disclosure in this case's lengthy record, as well as FFFP's subsequent unsuccessful attempts to obtain another waiver and amendment from the Simmons in 2008-2009.

{39} The district court, acting as the fact-finder in this case, is entitled to assess the credibility of the witnesses and assign weight to their testimony accordingly. *See, e.g.*, *New Mexicans for Free Enter.*, 2006-NMCA-007, ¶ 71 (stating that "[i]t is well established that where there is conflicting evidence, the trial court, as fact[-]finder, resolves all disparities in the testimony and determines the weight and credibility to be accorded to the witnesses" (alteration, internal quotation marks, and citation

25

omitted)); *Mares v. Valencia Cty. Sheriff's Dep't*, 1988-NMCA-003, ¶ 8, 106 N.M. 744, 749 P.2d 1123 (acknowledging that appellate courts do not second-guess a fact-finder's determination where it is supported by substantial evidence).The district court concluded that FFFP's actions violated the obligations set forth under 16.61.19.8(A) NMAC and the Simmons' purchase agreement to act with honesty and to disclose any adverse material facts. Reviewing the evidence in favor of the party that prevailed below, we conclude that a reasonable mind could accept the evidence presented as adequate to support a conclusion that FFFP breached its duty to exercise reasonable care or competence in communicating information regarding the Trust Property to the Simmons prior to their purchase of the property. *See Smith v. FDC Corp.*, 1990-NMSC-020, ¶ 13, 109 N.M. 514, 787 P.2d 433 (setting forth substantial evidence standard). Because they were supported by substantial evidence, the district court's findings were appropriate in this instance, as FFFP, through its brokers, knew that potential involvement in litigation was an adverse material fact to the Simmons, based on their abandoning interest in another home for just that reason.

**b.    Justifiable Reliance**

{40}    FFFP also asserts that the written purchase agreement precludes the Simmons from justifiably relying on representation regarding the possibility of future

26

development surrounding the property.[11] The Simmons assert that they would not have bought the property had they known of the existence of the covenant violation and waiver and amendment. They assert that they relied on Lyon and Van Camp's misrepresentations as to the existence of the covenant and their right to enforce it, absent any waiver or amendment, to protect their expectations regarding development density, traffic, and dust.

{41}     FFFP's assertion that the sales agreement precludes a claim of negligent misrepresentation is loosely based on a concept originating in *Rio Grande Jewelers*

---

[11]The language of the purchase agreement provides, "Buyer understands and acknowledges that Broker cannot and does not warrant or guarantee the condition of the Property . . ., nor does Broker guarantee that all defects have been disclosed by Seller." "Both Parties acknowledge that Broker did not and cannot examine the status of . . . future development plans[.]" Furthermore, the agreement states that "Buyer acknowledges that Buyer has not received or relied upon any representations by either Broker or Seller with respect to the condition of the Property other than those contained in th[e] Agreement, or in the Property Disclosure Statement[.]" In fact, it specifies that "[a]ny disclosure Buyer obtains should not be deemed by Buyer as a substitute for due diligence by Buyer, such as inspections by qualified professionals." Most importantly, the purchase agreement addresses future development:

> Buyer is aware that the Property may be affected by future development of property in the neighborhood or surrounding areas, including, without limitation, view, noise, traffic, local services, safety and water restrictions. . . . Buyer agrees that Seller and Broker make no representation as to the preservation of present/future views, and that present/future views may be affected by future development/construction/alteration of neighboring property or other impairments.

*Supply, Inc. v. Data General Corp.*, 1984-NMSC-094, ¶¶ 6, 8, 101 N.M. 798, 689 P.2d 1269. In *Rio Grande Jewelers Supply*, our Supreme Court addressed a very specific issue: whether, in a sale of goods context governed by the New Mexico Uniform Commercial Code, a commercial purchaser may maintain an action in tort against the seller for pre-contract negligent misrepresentations where the subsequently executed written sales contract contains an effective provision disclaiming all prior representations and all warranties not contained in the contract. *Id.* ¶ 1. The Court's analysis blended a consideration of the parol evidence rule with an acknowledgment of our State's freedom of contract policy. *Id.* ¶ 3. Reasoning that the representations alleged in the negligent misrepresentation count were the same as those alleged for breach of warranties, the Court concluded that the claim for negligent misrepresentation was "nothing more than an attempt to circumvent the operation of the Commercial Code" and an attempt "to allow the contract to be rewritten under the guise of an alleged action in tort." *Id.* ¶ 6.

{42} This case is distinguishable from *Rio Grande Jewelers Supply*, as it deals with a real estate contract rather than a contract governed by the New Mexico Commercial Code. In addition, the purchase agreement's limitation of liability does not limit FFFP's tort liability for its conduct in this case. The purchase agreement does not alleviate FFFP's duty to disclose material facts regarding valuable property rights;

28

rather it imposes a duty to do so. The only thing that the purchase agreement disclaims is reliance on representations regarding possible future occurrences. The Simmons' reliance was on FFFP's representations as to the present status of the property, particularly the covenant and the existence of a waiver and amendment, as it existed at the time of the sale. The Simmons thus relied on representations regarding a valuable property right rather than any representations regarding future adjacent development. While it is true that "freedom of contract and notions of contractually assumed duties and liabilities can act to limit general tort liability in certain circumstances when limited liability is expressly bargained for[,]" this case does not present such a circumstance. *State ex rel. Udall v. Colonial Penn Ins. Co.*, 1991-NMSC-048, ¶ 37, 112 N.M. 123, 812 P.2d 777. This is particularly true in light of FFFP's knowledge of the covenant violation, their role in actively promoting waivers among the HMBL Property owners, and their specific assertions that they informed the Simmons of the status of these issues. We therefore conclude that FFFP's assertion that the Simmons' reliance was not justified is without merit.

**2.    Negligence Per Se**

{43}    FFFP suggests that Simmons failed to prove that FFFP did not exercise the reasonable care or competence required of brokers. In doing so, FFFP challenges the district court's findings regarding negligence per se. FFFP reasons that the duties

29

enumerated in 16.61.19.8 NMAC (1/1/2004) do not have the specificity required to satisfy a claim of negligence per se. Negligence per se consists of four elements:

> (1) There must be a statute [or regulation] which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute [or regulation], (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the Legislature through the statute sought to prevent.

*Thompson v. Potter*, 2012-NMCA-014, ¶ 32, 268 P.3d 57 (alteration, internal quotation marks, and citation omitted). FFFP challenges the district court's conclusion only as to the first and second elements. Negligence per se exists only where a statutory or regulatory provision imposes an absolute duty to comply with a specific requirement. *See Heath v. LaMariana Apartments*, 2008-NMSC-017, ¶¶ 8-9, 143 N.M. 657, 180 P.3d 664. The statute or regulation at issue "must specify a duty that is distinguishable from the ordinary standard of care." *Thompson*, 2012-NMCA-014, ¶ 32. It is the court's task "to determine whether the statutory *or regulatory provisions* at issue define with specificity what is 'reasonable' in a particular circumstance, such that the [fact-finder] does not have to undertake that inquiry." *Heath*, 2008-NMSC-017, ¶ 9 (emphasis added).

{44} FFFP's argument that the duties enumerated in 16.61.19.8 NMAC are not sufficiently specific to satisfy a claim of negligence per se overlooks the very specific provision of 16.61.19.8(H) NMAC (1/1/2004), which requires brokers to disclose in

30

writing "any adverse material facts actually known by the associate broker or qualifying broker about the property or transaction[.]" This is a clear standard of conduct that FFFP was required to comply with, and in our discussion of negligence we have set forth the evidence supporting the district court conclusion that FFFP failed to comply with this standard. FFFP failed to make the disclosures required by this regulation, and as customers, the Simmons are people that the regulation is aimed at protecting. The expenses the Simmons incurred in relying on FFFP's representations and purchasing the Trust Property are the type of harm that the regulation is intended to prevent. We therefore reject FFFP's argument that the first and second elements of negligence per se were not proven here.

**3.      Damages**

**i.      Actual Damages for Negligence Per Se and Negligent Misrepresentation**

{45}      The district court concluded that the Simmons suffered actual damages as a consequence of FFFP's negligent misrepresentation and negligence per se. As a result, it awarded the Simmons $123,000 for overpayments in the purchase of three of the lots within the Trust Property. The district court arrived at this value by concluding that the Gammons' covenant violations diminished the value of three lots within the Trust Property by $41,000, or 17%, per lot. The diminishment in value was due to the increased development, density, and degradation of view caused by the

31

covenant violation, and resulted in an actual value of $199,000 for each of those lots despite the Simmons having purchased them for $240,000.

{46} FFFP asserts that there is insufficient evidence to establish damages for diminution in value of the Trust Property. *See, e.g.*, *Weststar Mortg. Corp. v. Jackson*, 2003-NMSC-002, ¶ 8, 133 N.M. 114, 61 P.3d 823 ("If the verdict below is supported by substantial evidence, which we have defined as 'such relevant evidence that a reasonable mind would find adequate to support a conclusion,' we will affirm the result." (quoting *Landavazo v. Sanchez*, 1990-NMSC-114, ¶ 7, 111 N.M. 137, 802 P.2d 1283)). While diminution of value is relevant as a measure of damages for injury to real property, *McNeill v. Burlington Resources Oil & Gas Co.*, 2008-NMSC-022, ¶ 27, 143 N.M. 740, 182 P.3d 121, the measure of damages for a negligent misrepresentation is that which is necessary to compensate for pecuniary loss caused by the misrepresentation. Restatement (Second) of Torts § 552B(1) (1977) (stating that such damages include "the difference between the value of what he has received in the transaction and its purchase price or other value given" and pecuniary loss suffered as a consequence of reliance upon the misrepresentation); *see First Interstate Bank of Gallup v. Foutz*, 1988-NMSC-087, ¶ 8, 107 N.M. 749, 764 P.2d 1307. FFFP is therefore advocating the use of the incorrect measure of damages. *See Varga v. Ferrell*, 2014-NMCA-005, ¶¶ 49-50, 362 P.3d 96.

{47} At trial, the district court heard the testimony of Barry Hunnicutt, a real estate appraiser. Hunnicutt conducted an appraisal of the Trust Property in 2011, and conducted a retrospective appraisal to determine the value of the Trust Property in June 2005. Hunnicutt's appraisal can be separated into two parts: the appraisal of Lot 4C within the Trust Property, and the appraisal of the rest of the lots of the Trust Property. As to Lot 4C, Hunnicutt concluded that the construction of the Gammons' house on Lot 4A2 impacted the view corridor in such a way that the lot suffered a 17% diminution in value. Hunnicutt's conclusion in this respect took only the Gammons' house—not the Goldstein house—into account because it was the only one on Lot 4A2 that was in Lot 4C's sight line. Hunnicutt acknowledged that he was aware that the Gammons' house's impact on Lot 4C's view already existed as of June 2005. Nonetheless, Hunnicutt concluded that Lot 4C had suffered a 17% diminution, resulting in a value of $199,000.

{48} For the rest of the lots within the Trust Property, Hunnicutt applied a hypothetical condition to evaluate the value of the land. That hypothetical was that each lot of five or more acres that was contiguous to the Trust Property could be split into two lots and any vacant lot less than five acres could be built on. Applying that hypothetical to Lots 4D and 4B, Hunnicutt similarly concluded that there was a 17% diminution in value as to those lots and as such they were worth only $199,000.

33

Hunnicutt's conclusions as to both Lot 4C and the remaining lots were based on adversely impacted views, which were downgraded from "very good" to "good." FFFP did not submit any evidence regarding the value of the Trust Property.

{49} A reasonable mind would find this evidence adequate to support the district court's award of $41,000 for each of the three lots within the Trust Property. The Simmons had the burden of providing evidence of pecuniary loss, and they did so by proffering evidence regarding the difference between the value of the Trust Property and the purchase price that they paid in reliance upon FFFP's misrepresentations. FFFP's argument that the district court improperly awarded future damages that were not "reasonably certain to occur" is unpersuasive. *Cf. Frank Bond & Son, Inc. v Reserve Minerals Corp.*, 1959-NMSC-016, ¶ 4, 65 N.M. 257, 335 P.2d 858 (stating that "damages may be awarded where there is no uncertainty as to whether the rights of the plaintiff were invaded, even though there may be some uncertainty respecting the amount of damages sustained" (quoting *Stern v. Dunlap Co.*, 228 F.2d 939, 943 (10th Cir. 1955)).

**ii.    Actual Damages for FFFP's Commission**

{50} The district court awarded the Simmons actual damages in the amount of $452,287.95. Of that amount, $123,000 was for the difference between the purchase price and value of the Trust Property, and $202,725 was for commissions and gross

34

receipts taxes paid to FFFP that "would not have been paid but for [FFFP's] negligent misrepresentations." FFFP asserts that by awarding actual damages for both the property value and for the commission paid, the district court awarded impermissibly duplicative damages. FFFP also asserts that the Simmons never proved that they paid the commission, and could not do so because the commission was paid by seller out of the sales proceeds. The Simmons assert that seller received the money to pay FFFP's commission from them at closing.

{51}     While we agree with FFFP's assertion that the Simmons elected to pursue damages for the negligent misrepresentation claim alone, we disagree with FFFP's conclusion that the district court could not award damages based on FFFP's commission because doing so would be duplicative. *Cf. Miller v. Bank of Am., N.A.*, 2015-NMSC-022, ¶ 24, 352 P.3d 1162 ("A damage award including both diminution in value attributable to breach and disgorgement of profit is not necessarily a double recovery."). The relevant rule on this issue is that "[w]here there are different theories of recovery and liability is found on each, but the relief requested was the same, namely compensatory damages, the injured party is entitled to only one compensatory damage award." *Hood v. Fulkerson*, 1985-NMSC-048, ¶ 12, 102 N.M. 677, 699 P.2d 608.

{52} This is not a case where the Simmons pursued multiple theories of recovery, prevailed, and were required to make an election among awards.[12] *See Cent. Sec. & Alarm Co. v. Mehler*, 1996-NMCA-060, ¶ 12, 121 N.M. 840, 918 P.2d 1340 (requiring an election of remedies if the plaintiff pursues several theories of recovery and liability is found on each). Instead, the Simmons pursued a single theory of recovery in asserting negligent misrepresentation, prevailed, and are entitled to a single award of compensatory damages ($452,287.95), which happens to be comprised of multiple components; loss of property value, commissions, and transaction costs respectively ($123,000, $202,725, and 125,562.95). As acknowledged by FFFP, the Simmons pursued only the negligent misrepresentation claim. The district court awarded compensatory damages for only that claim. FFFP points to no case law to support its suggestion that a court errs in considering multiple sources of pecuniary loss when calculating the appropriate compensatory damages award in a negligent misrepresentation claim. FFFP therefore cannot prevail on this point. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d

[12]FFFP presents an unclear argument on this point, suggesting that the Simmons pursued an equity claim, and that the commission was awarded as an element of damages in equity. Thus, FFFP argues, the district court could not award actual damages of diminished value and carry costs plus "additional equitable damages." This argument is unclear and undeveloped, and we do not address it. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

1329 (stating that "[w]e assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority. We therefore will not do this research for counsel[,]" and employing the rule that issues raised in briefs but unsupported by authority are not reviewed on appeal).

{53} We next address FFFP's argument that the Simmons cannot recover compensatory damages for commissions that they did not pay. The Simmons suggest that the evidence proffered at trial demonstrated that their mortgage included FFFP's sales commission, and that the seller's payment of the commission was financed by money provided by the Simmons at closing. Both parties point to the title company's settlement statement as the only evidence pertinent to this issue. That document lays out the sales price of the Trust Property. The document states that $190,800 in commission was to be "Paid From Seller's Funds at Settlement" and includes $11,925, also to be paid from seller's funds, for gross receipts tax on FFFP's commission. FFFP's commission was added to other fees and was included in a "reduction in amounts due to Seller." Thus, we conclude that substantial evidence supports the Simmons' assertion that FFFP's commission was paid out of money that the Simmons paid to purchase the Trust Property.

{54} Disgorgement is a remedy that requires a wrongdoer to give up the benefits obtained as a result of his wrongdoing. *See Peters Corp. v. N.M. Banquest Inv'rs*

*Corp.*, 2008-NMSC-039, ¶ 32, 144 N.M. 434, 188 P.2d 1185. "The decision whether to order a defendant to disgorge profits and the amount of profits to be disgorged rests within the sound discretion of the [district] court." *Id.* The remedy of disgorgement may not be used punitively, and a causal connection must exist between the breach and the benefit sought to be disgorged. *Id.* The evidence supports the conclusion that the Simmons paid $123,000 more than the value of the Trust Property because of misrepresentations made by FFFP. *See Jacobs v. Phillippi*, 1985-NMSC-029, ¶ 5, 102 N.M. 449, 697 P.2d 132 (reviewing an appeal of damages award for substantial evidence). Thus, FFFP's misrepresentations and its commission are only causally connected by the portion of the commission that arose from the $123,000 overpayment that the Simmons made. FFFP is therefore properly required to disgorge the portion of its commission that was paid as a result of its misrepresentations. We conclude that FFFP is entitled to keep its commission from the sale of the Trust Property except for the portion stemming from the $123,000 that the Simmons overpaid. We remand so that the district court may adjust the amount of commission to reflect the $123,000 diminution in the Trust Property's value.

**iii.    Carry-Cost Damages**

{55}    The district court awarded the Simmons $202,725 for FFFP's commission and gross receipts taxes that would not have been paid but for FFFP's actions, and

$126,562.95 in mortgage principal and interest, which also would not have been paid but for FFFP's actions. The parties have labeled these "carry-cost" damages—a characterization that we will continue using throughout the remainder of this opinion. FFFP asserts that the district court's award of carry-cost damages was improper because it violates due process principles and because there is insufficient evidence to support the award. Due process has been provided where a party is afforded timely notice, a reasonable opportunity to be heard, a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence, representation by counsel, and a hearing before an impartial decision maker. *In re Pamela A.G.*, 2006-NMSC-019, ¶ 12, 139 N.M. 459, 134 P.3d 746. FFFP's due process argument hinges on its assertion that, because the chart was only used as a demonstrative aid during closing arguments, FFFP never had the chance to cross-examine any witness as to the calculations of the carry costs listed in the chart.

{56} During closing arguments, the Simmons presented the district court with a demonstrative aid, which laid out the calculations behind their request for carry-cost damages. In that chart, the Simmons added the monthly mortgage cost and real estate tax for the portion of the Trust Property that had, according to Hunnicutt, diminished in value, namely, Lots 4B, 4C, and 4D, as well as the real estate commission paid to FFFP. Those costs were then multiplied by seventy-three—the number of months

39

between Simmons' purchase and the trial. Adding together those calculations, the chart suggests a carry-cost damage award in the amount of $126,561.95. The district court awarded Simmons $126,562.95 in carry-cost damages.[13]

{57}     The record reveals, however, that during his testimony, Mr. Simmons set forth the basic formula that is used in the chart. Mr. Simmons testified that he had a 5.5% annual interest on his mortgage and that he had owned the property for seventy-three months. Mr. Simmons also testified as to what he believed the real estate tax rate was in 2010, and stated that it should be considered in the calculation of damages. FFFP had the opportunity to cross-examine Mr. Simmons, and availed itself of that opportunity.

{58}     FFFP's assertion that there is insufficient evidence to support the carry-cost damages award is also without merit. Not only was there testimony from Hunnicutt regarding the diminution of value of the Trust Property lots and testimony from Mr. Simmons regarding the monthly mortgage rate, but there was also a title insurance settlement statement entered into evidence. That exhibit listed the amount of the Simmons' mortgage principal, county taxes, and the daily rate of interest. This evidence, considered together, is substantial enough to support the district court's

---

[13]The slight discrepancy in amounts is due to a miscalculation in the chart's total. When the values listed in the chart are added and multiplied correctly, the total carry-cost amount is $126,562.95.

findings as to the amount of damages. *Landavazo*, 1990-NMSC-114, ¶ 7 (defining substantial evidence and acknowledging that "[e]vidence is substantial even if it barely tips the scales in favor of the party bearing the burden of proof"). As such, the district court's assessment of carry-cost damages against FFFP will stand.

{59}     The district court's calculation of carry-cost damages included FFFP's entire commission for the sale of the Trust Property. Because the value of Lots 4B, 4C, and 4D within the Trust Property is 17% less than the original purchase price, the commission used for purposes of calculating carry-cost damages must be recalculated in light of that lower value. We therefore remand for the district court to recalculate the amount of FFFP's commission, and the carry-cost damages associated therewith, pursuant to this opinion.

**iv.     Attorney's Fees as Compensatory Damages**

{60}     Damages allowable for negligent misrepresentation are "those proximately caused by the misrepresentation." *Charter Servs., Inc. v. Principal Mut. Life Ins. Co.*, 1994-NMCA-007, ¶ 10, 117 N.M. 82, 868 P.2d 1307. We must therefore determine whether FFFP's misrepresentations regarding the covenant violations, waiver, and amendment caused the Simmons' expense of attorney's fees associated with involvement in this lawsuit. *See id.* (defining proximate cause as "that which in a natural and continuous sequence unbroken by any new independent causes produces the injury and without which the injury would not have occurred" (internal quotation

41

marks and citation omitted)). We review an award of attorney's fees for abuse of discretion. *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 6, 127 N.M. 654, 986 P.2d 450. "The district court abuses its discretion if it enters findings of fact that are not supported by substantial evidence." *Atherton v. Gopin*, 2015-NMCA-087, ¶ 25, 355 P.3d 804. If substantial evidence exists to support the district court's conclusion, we will not disturb that conclusion on appeal. *Landavazo*, 1990-NMSC-114, ¶ 7.

{61}     The district court awarded "compensatory damages in the form of reasonable attorney's fees" in the amount of $152,552.36. This award was based on the court's finding that "[a]s a consequence of the lack of required disclosure, . . . [t]he Simmons closed on the purchase of the . . . Trust Property and purchased property they would not have purchased had [FFFP] acted with honesty and reasonable care." Thus, the district court found that "[t]he Simmons have been required to retain counsel in order to protect their interests as a direct consequence of the original non-disclosures and misrepresentations by [FFFP]. The Simmons['] costs and fees arising from being sued by [FFFP] constitute additional damages arising from the wrongful conduct of [FFFP]." The court further concluded that FFFP "hoped to leverage the Simmons into executing the Amendment by subjecting them to the costs of suit and attorneys' fees by suing the Simmons" and that "[t]he costs and attorneys' fees incurred by the Simmons are a direct consequence of the series of misrepresentations and regulation

42

violations" of FFFP. As such, the district court concluded that the Simmons are entitled to recover those costs and fees in accordance with *Charter Services, Inc.*, 1994-NMCA-007.

{62} In *Charter Services, Inc.*, an employer purchased an insurance policy, relying on an insurance agent's assurance that no additional workers' compensation policy would be necessary if the employer chose one particular policy. *Id.* ¶ 2. The employer relied on that representation and purchased the policy. *Id.* Subsequently, an employee was injured, and sued the employer for workers' compensation. The employee asserted that she was fired in retaliation for her workers' compensation case, and she also filed a wrongful discharge claim. *Id.* ¶ 3. The employer incurred thousands of dollars in attorney's fees in defending the suit that the employee brought. *Id.* ¶ 5. Employer later filed suit against its insurance company for negligent misrepresentation regarding the coverage of the group insurance policy, *id.* ¶ 1, and it was awarded the total amount of attorney's fees for defending against both of the employee's claims. *Id.* ¶ 5. The insurance company appealed, arguing that only the fees for the workers' compensation claim should have been awarded against it. *Id.* ¶ 8.

{63} We disagreed and affirmed the district court's determination that the employer was entitled to recover all of its legal costs incurred during the suit against its employee. *Id.* ¶ 11. This Court pointed out that the appropriate damages in a negligent

43

misrepresentation case are "those proximately caused by the misrepresentation." *Id.* ¶ 10. This Court also reasoned that because all of the employer's costs in defending against the employee's lawsuit flowed directly from the insurance agent's misrepresentations concerning the policy, the employer was entitled to recover attorney's fees. *Id.* ¶ 11.

{64}     Though not cited by either party, we also find *First National Bank of Clovis v. Diane, Inc.*, 1985-NMCA-025, 102 N.M. 548, 698 P.2d 5, to be instructive. The bank sued the corporation on promissory notes evidencing a loan, and the corporation filed a third-party claim against the broker, who had negotiated the loan on the corporation's behalf. *Id.* ¶ 3. The corporation prevailed against the broker. *Id.* ¶ 4. The broker then filed a cross-claim against his attorney, alleging malpractice on the basis that he had sought the attorney's advice regarding the legality of the brokerage fee he had charged, and for which the corporation had ultimately recovered damages. *Id.* ¶¶ 4-5. In the cross-claim, the district court awarded the broker $25,000 in attorney's fees incurred "as a proximate result of the advice given to [the broker]" by the attorney. *Id.* ¶ 31. The attorney appealed.

{65}     We acknowledged the general rule that attorney's fees are not allowable absent a statute or agreement authorizing them, and agreed with the attorney that the broker could not recover attorney's fees for the malpractice action he brought against the attorney. *Id.* This Court did, however, allow the broker to recover the attorney's fees

44

incurred while defending the suit against the corporation: "where, as here, a client is required to engage counsel *to defend a separate action* proximately resulting from his attorney's negligence, reasonable fees incurred may be awarded[.]" *Id.* ¶¶ 33, 35 (emphasis added). In total, the award of $25,000 in attorney's fees was remanded so that the district court could recalculate the award, allowing only the attorney's fees incurred in defending against the corporation's third-party claim.

{66}     These cases reveal that a party can recover attorney's fees incurred to defend against litigation where it is involved in the litigation by a third party, resulting from reliance on the representations of another. *First National Bank of Clovis*, demonstrates that attorney's fees are recoverable in a procedural posture such as this one, where attorney's fees incurred as a result of one action are recoverable in another action. This case is analogous to *First National Bank of Clovis* because both cases question whether a party acting as both a plaintiff and a defendant may be awarded attorney's fees. In *First National Bank of Clovis*, the broker acted as a defendant when he was brought into the primary action through a third-party action, just as the Simmons acted as defendants when they were brought into this litigation through FFFP's third-party complaint in the Cobb Plaintiffs' litigation over the validity of the covenants. *See id.* ¶ 3. The broker then acted as a plaintiff by filing a cross-claim against his attorney, whose representations proximately caused his involvement in the third-party action, just as the Simmons acted as plaintiffs by filing a countersuit

45

against FFFP, whose actions also proximately caused the Simmons' involvement in the third-party action. *See id* ¶ 4. We see no reason for FFFP's role as both the plaintiff in the third-party action and the defendant in the counter-suit to alter our analysis under *First National Bank of Clovis*, particularly in light of the various roles it played in the sale and resale of the HMBL Property.[14]

{67}    Following the precedent set forth in *Charter Services, Inc.*, and *First National Bank of Clovis*, we conclude that the Simmons are entitled to recover attorney's fees spent in defending against FFFP's third-party action against them. The Simmons are not, however, entitled to attorney's fees incurred while litigating their counter-claim; to allow such a recovery would violate the American Rule. *See N.M. Right to Choose/NARAL*, 1999-NMSC-028, ¶ 9 (stating that generally, the American Rule provides that "absent statutory or other authority, litigants are responsible for their own attorney's fees"). We therefore reverse, so the district court may award only those attorney's fees incurred in defending against FFFP's third-party action. *See Charter Services, Inc.*, 1994-NMCA-007, ¶ 8 ("[W]hen an attorney's services are rendered in pursuit of multiple objectives, some of which permit a fee and some of

---

[14]FFFP represented the Gammons in their purchase of Lot 4A2, the sellers during their sale of the Trust Property, and the Simmons during their purchase of the Trust Property. As FFFP is willing to play fast and loose with its roles in representing these parties, it must face the consequences of doing so.

which do not, the trial court must apportion the fees and award only those that are compensable.").

## IV.    CONCLUSION

{68}    The restrictive covenant in this case is enforceable by anyone owning a lot within the HMBL Property. FFFP negligently misrepresented the status of the covenant's waiver and amendment to the Simmons during the sale of the Trust Property. As a result, the Simmons are entitled to actual damages. The Simmons provided sufficient evidence that they overpaid $123,000 for Lots 4B, 4C, and 4D and that award is affirmed. We remand the remaining portion of the Simmons' award so that the district court may recalculate the appropriate amount consistent with this opinion. This recalculation includes a reduction in FFFP's commission proportionate to the $123,000 overpayment, a corresponding reduction in the amount of commission used to calculate carry-cost damages, and a differentiation between attorney's fees incurred in defending the third-party action (recoverable) and in pursuing the negligent misrepresentation claim (not recoverable).

{69}    **IT IS SO ORDERED.**

_____

**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Chief Judge**

_____

**MICHAEL D. BUSTAMANTE, Judge**